09-3007-cr
USA v. Colon (Rojas)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: July 14, 2010          Decided: August 12, 2010)

Docket No. 09-3007-cr

UNITED STATES OF AMERICA,

Appellee,

—v.—

NICHOLAS ROJAS,

Defendant-Appellant.

Before:  JACOBS, Chief Judge, WESLEY and CHIN, Circuit
         Judges.

Appeal from the judgment of the United States District Court for the District of Connecticut (Kravitz, J.), entered on July 9, 2009, sentencing defendant principally to eighty months' imprisonment.  Defendant was convicted, after a jury trial, of one count of conspiracy to possess with the intent to distribute, and to distribute, five grams or more of cocaine base and two counts of use of a telephone to facilitate the commission of a drug trafficking felony.  On appeal, defendant challenges the sufficiency of the evidence on which his conspiracy conviction rests.  He further contends that the district court erred in recalling the jury

after it had been pronounced "discharged" to correct an error in the reading of the written verdict form. Defendant maintains that these asserted errors require vacatur of his conviction with respect to the conspiracy count. We disagree. The evidence was sufficient to sustain the jury's verdict and the district court did not err in recalling the jury. Accordingly, the judgment of the district court is hereby AFFIRMED.

————————————

S. DAVE VATTI, Assistant United States Attorney (Sandra S. Glover, Assistant United States Attorney, on the brief), for Nora R. Dannehy, United States Attorney for the District of Connecticut, Hartford, CT, for Appellee.

JONATHAN J. EINHORN, New Haven, CT, for Defendant-Appellant.

————————————

WESLEY, Circuit Judge:

On May 16, 2008, a jury found defendant Nicholas Rojas guilty of conspiring to possess with the intent to distribute, and to distribute, five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. The jury also found Rojas guilty of using a telephone to facilitate the commission of a drug trafficking felony in violation of 21 U.S.C. § 843(b). At trial, the government presented evidence that Rojas functioned as a

street-level crack dealer in a large-scale narcotics trafficking organization headed by Luis A. Colon, also known as Anthony Colon.

On appeal, Rojas contends that the evidence at trial was insufficient to establish that he joined the charged conspiracy. Specifically, Rojas argues that while he sold drugs he acquired from Colon, he did so only to finance his own drug habit. Rojas also asserts that it was improper for the district court to recall the jury, after it had been declared "discharged" but before it had dispersed, in order to correct a misreading of the written verdict form and to re-poll the jury. We hold that the evidence was sufficient to support the jury's verdict. We further hold that, based on the totality of the facts and circumstances presented by this case, it was not error for the district court to recall the jury. We therefore affirm.

I. BACKGROUND

At trial, the government presented evidence that, in October of 2005, the Federal Bureau of Investigation ("FBI")

commenced an investigation into a drug trafficking organization, which was operating in Waterbury, Connecticut.[1]  At the center of this criminal organization was Anthony Colon, who served as a cooperating witness for the government at trial.  The evidence demonstrated that Rojas interacted with Colon on an almost daily basis.  According to FBI agent William Aldenberg, who testified at trial, the government intercepted Colon's phone calls over a period of approximately ninety days.  Agent Aldenberg estimated that the government introduced twenty-three audio recordings of conversations between Colon and Rojas.  Agent Aldenberg further testified that Rojas used thirteen different phones to place calls to Colon, and that the use of multiple phones is common among street-level distributors in drug conspiracies.

---

[1] The original indictment in this case contained thirteen counts charging thirty one individuals with various narcotics offenses.  A superseding indictment, on which the government proceeded to trial, was subsequently returned against Rojas.  Rojas was tried with one other individual, who was charged in a separate indictment.  The co-defendant tried with Rojas is not implicated by this appeal.

In his capacity as a cooperating witness, Colon testified that he had a longstanding relationship with Rojas. Colon explained that he brought Rojas into his drug trafficking organization because he knew him; according to Colon, Rojas was buying drugs on a street corner where Colon's organization operated prior to the point at which Rojas joined the conspiracy. Colon further testified that, at the nascency of their conspiratorial relationship, he told Rojas that he would have to give him a "test" to determine his reliability. Trial Tr. 342:5, May 13, 2008. Once their relationship was established, Colon provided drugs to Rojas "on credit," Trial Tr. 418:14-15, May 13, 2008, usually when he was assured that Rojas had a customer to whom he would resell the drugs. Colon attested that he "trust[ed]" Rojas. Trial Tr. 342:23, May 13, 2008. As evidence of this trust, he would permit Rojas to pick up crack cocaine "on credit" from his house for resale. Trial Tr. 349:20-25, 350:1, May 13, 2008.

At trial, the government elicited testimony from Colon

5

that, on multiple occasions, he bailed Rojas out of jail because Rojas "was moving product" for him.  Trial Tr. 418:19-25, 419:1-12, May 13, 2008.  The government introduced the bond paperwork to corroborate Colon's testimony in this regard.  As additional evidence of the conspiratorial relationship, a recorded conversation was played at trial in which Rojas referred to himself as Colon's "partner."  Trial Tr. 356:12, May 13, 2008.  Colon explained that he understood Rojas to be communicating that he was his "boy."  Trial Tr. 356:14-16, May 13, 2008.

Rojas maintained at trial — and now argues before this Court — that he was merely a drug user who purchased drugs from Colon, but that he was not a member of the charged conspiracy.  In light of this contention, the district court instructed the jury that "mere knowledge or acquiescence without participation in the unlawful plan is not sufficient" to form the basis of a conspiracy conviction.  Trial Tr. 578:8-10, May 14, 2008.  The district court explained to the jury that "the fact that the acts of a

defendant, without knowledge, merely happen to further the purposes or the objectives of the conspiracy does not make that defendant a conspirator." Trial Tr. 578:10-13, May 14, 2008.

The court also provided the jury with what is commonly referred to as a "buyer-seller" instruction. Specifically, the court stated:

> [W]ithout more, the mere existence of a buyer/seller relationship is insufficient to establish membership in a conspiracy. In deciding whether parties to a sale of narcotics are merely a buyer and seller, or instead are co-conspirators, the jury may properly consider a number of factors, including the length of time that the buyer affiliated with the seller; whether there was a common goal among the parties to advance the conspiracy's interests; whether there was an agreement or understanding to redistribute drugs; the established method of payment; the extent to which the transactions were standardized; the quantities of drugs involved; and whether there was mutual trust between the buyer and the seller. None of these factors is dispositive, nor is this listing intended to be exhaustive.

Trial Tr. 578:19-25, 579:1-8, May 14, 2008. The court instructed that, in order for Rojas to be deemed a co-

conspirator, the government was required to prove, beyond a reasonable doubt, that Rojas "participated with knowledge of at least some of the unlawful purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends." Trial Tr. 578:15-18, May 14, 2008.

On May 16, 2008, the jury returned its verdict, finding Rojas guilty of conspiring to possess with intent to distribute, and to distribute, controlled substances. On the written verdict form prepared by the court, the jury made a specific finding that "it was reasonably foreseeable to Nicholas Rojas that the conspiracy charged . . . involved the possession with the intent to distribute or the distribution of five grams or more of a mixture and substance containing a detectable amount of cocaine base." Def. App. at 127 (emphasis added) (verdict form as to Rojas). It made a finding that the drug quantity attributable to the defendant was five grams or more of cocaine base. Def. App. at 127 (emphasis added) (verdict

form as to Rojas).  The jury also returned a verdict concluding that Rojas was guilty of two counts of using a telephone to facilitate the commission of a drug trafficking felony in violation of 21 U.S.C. § 843(b).  Def. App. at 128 (verdict form as to Rojas).

During the courtroom deputy's reading of the jury's written verdict form, the deputy made several errors, one of which forms a basis for this appeal.  First, when reading the jury's verdict as to the conspiracy charge, the deputy omitted the word "base" and simply stated "five grams or more of a mixture and substance containing a detectable amount of cocaine."  Trial Tr. 691:12-14, May 14, 2008 (emphasis added).  Similarly, with respect to the counts involving the use of a telephone to facilitate a drug crime, the deputy omitted the word "base" and simply referred to the use of a telephone to "facilitate the knowing, intentional, and unlawful possession with intent to distribute and distribution of cocaine."  Trial Tr. 691:25, 692:1-4, May 14, 2008 (emphasis added).

The error with respect to the telephone counts was brought to the court's attention before the jury was declared "discharged," and was quickly corrected. Trial Tr. 697:17-25, 698:1-2, May 14, 2008. However, when the court asked if counsel for either party wanted the verdict re-read in its entirety, counsel declined and indicated that they only wished to have the verdict re-read with respect to the telephone counts. Trial Tr. 697:17-21, May 14, 2008. Consequently, the error as to the conspiracy count was not detected until the jury had been polled, pronounced "discharged," and had returned to the deliberation room to await the thanks of the court for its service. It was at this time that counsel reviewed the transcript of the deputy's reading of the verdict form and realized that the word "base" had also been omitted in the reading of the conspiracy count. The lawyers alerted the district judge to this omission. Counsel for both sides and the court then discussed how to proceed. The court asked defense counsel if he would consent to having the jury returned to the

courtroom and re-polled; defense counsel declined to consent to this course of action. Noting defense counsel's objection, the court nonetheless recalled the jury, which had not yet left the jury room. Once the jurors were reassembled in the courtroom, the court explained why they had been asked to return, instructed the deputy to re-read the verdict form, and then re-polled the jury. The jury assented to the corrected reading of the verdict form and was declared "discharge[d]" a second time.

On June 17, 2008, Rojas filed a motion in the district court for a judgment of acquittal, Fed. R. Crim. P. 29, or, in the alternative, for a new trial, Fed. R. Crim. P. 33. This motion was based solely on his allegation that insufficient evidence supported his conviction. The district court denied the motion on December 19, 2008, concluding that there was "no doubt that the evidence in its totality" was sufficient to allow the "jury to find beyond a reasonable doubt that Mr. Rojas was not merely a buyer or seller of narcotics, but rather that he knowingly and

intentionally participated in the Colon narcotics-distribution conspiracy by agreeing to accomplish its illegal objective beyond the mere purchase or sale of drugs." United States v. Rojas, No. 06 Cr. 269 (MRK), 2008 WL 5329006, at *6 (D. Conn. Dec. 19, 2008). Ruling only on Rojas' contention with respect to the sufficiency of the evidence, the court also declined to grant a new trial pursuant to Rule 33, finding no miscarriage of justice in the jury's verdict. Id. at *8.

Rojas was sentenced on July 8, 2008 and judgment was entered against him on July 10, 2009. D. Ct. Doc. Nos. 1281, 1282. Defendant's timely notice of appeal followed.

## II. DISCUSSION

### A. Sufficiency of the Evidence

It is well-established that a defendant challenging the sufficiency of the evidence "'bears a heavy burden.'" United States v. Hawkins, 547 F.3d 66, 70 (2d Cir. 2008) (quoting United States v. Parkes, 497 F.3d 220, 225 (2d Cir. 2007)). "On such a challenge, we view the evidence in the

12

light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." Id. (internal quotation marks omitted). We must evaluate the evidence in its totality, United States v. Wexler, 522 F.3d 194, 207 (2d Cir. 2008), and uphold the jury's verdict as long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). This inquiry is distinct from asking whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt. Id. at 318-19. In assessing the sufficiency of the evidence in the context of a conspiracy conviction, "deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." Wexler, 522 F.3d at 207 (alteration in original and internal quotation marks omitted).

"As a literal matter, when a buyer purchases illegal drugs from a seller, two persons have agreed to a concerted effort to achieve the unlawful transfer of the drugs from the seller to the buyer.  According to the customary definition, that would constitute a conspiracy . . . ." United States v. Parker, 554 F.3d 230, 234 (2d Cir. 2009). There is, however, a "narrow exception to the general conspiracy rule," upon which defendant relies, applicable to transactions between a buyer and a seller of drugs.  Id. Under this exception, a buyer-seller relationship, "[w]ithout more," is insufficient to establish a conspiracy. United States v. Gore, 154 F.3d 34, 40 (2d Cir. 1998).  The rationale for this exception is that, while a drug sale is a substantive crime, it should not be characterized as a conspiracy because it "has no separate criminal object." Wexler, 522 F.3d at 208 (internal quotation marks omitted).

Significantly, the fact that a buyer-seller relationship exists between co-conspirators does not insulate a buyer from a conspiracy charge "if the facts

14

support such a charge." Parker, 554 F.3d at 232. In other words, the exception "does not protect either the seller or buyer from a charge [that] they conspired together to transfer drugs if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers, whether by the seller or by the buyer." Id. at 235. Here, the defendant does not dispute that a conspiracy headed by Colon existed. Rather, he claims that there was insufficient evidence to prove his membership in the conspiracy. We reject this contention because the evidence reveals more than a mere buyer-seller relationship; there is "additional evidence showing an agreement to join together to accomplish an objective beyond the sale transaction" from which a rational jury could have inferred that Colon and Rojas were co-conspirators. Hawkins, 547 F.3d at 72.

While our Circuit has "avoided listing factors to guide what is a highly fact-specific inquiry into whether the circumstances surrounding a buyer-seller relationship establish an agreement to participate in a distribution

conspiracy," we have noted the "relevance" of certain factors identified by other circuit courts of appeal. Id. at 74 (citing United States v. Hicks, 368 F.3d 801, 805 (7th Cir. 2004); United States v. Gibbs, 190 F.3d 188, 199 (3d Cir. 1999)). For example, the existence of "sales on credit," such as those that took place between Colon and Rojas, have been used "[t]o distinguish between a buyer-seller relationship and a conspiratorial agreement." Hicks, 368 F.3d at 805; see also Hawkins, 547 F.3d at 74.

In this case, defendant asked for and was given a jury instruction regarding the buyer-seller exception. While we do not reach the question of whether defendant was entitled to such an instruction, cf. United States v. Medina, 944 F.2d 60, 65 (2d Cir. 1991) (finding "the district court did not err in refusing to give the . . . 'buyer-seller' instruction" because there was "advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use"), we find that the instruction given was not in error. The district

court properly instructed the jury that "the mere existence of a buyer/seller relationship" was not sufficient to establish membership in a conspiracy, and the district court correctly informed the jury that in determining whether Rojas was a mere buyer on instead a member of the conspiracy, it could consider a number of non-dispositive, non-exclusive factors.

A non-exclusive list of considerations relevant to a jury's determination of whether a defendant was a member of a charged conspiracy, or a merely a buyer and user of drugs, would include:  Did the buyer seek to advance the conspiracy's interests?  Was there mutual trust between buyer and seller?  Were the drugs provided on credit?  Did the buyer have a longstanding relationship with the seller?  Did the buyer perform other duties on behalf of the conspiracy?  Were the drugs purchased for a re-distribution that was part of the conspiratorial enterprise?  Did the quantity of drugs purchased indicate an intent to re-distribute?  Were the buyer's profits shared with the

members of the conspiracy?  Did the buyer/re-distributor have the protection of the conspiracy (physically, financially, or otherwise)?  Was his point of sale assigned or protected by members of the conspiracy?  Did the buyer use other members of the conspiracy in the re-distribution?  The jury may consider these, and any other relevant matters, in deciding whether a buyer of drugs is a member of the distribution conspiracy.  Here, based on the evidence presented, the jury was entitled to reject defendant's contention that his conduct fit within the buyer-seller exception to ordinary conspiracy law principles.

Rojas clearly enjoyed the benefit of a relationship that exceeded one of simply a buyer and a seller in negotiating sales "on credit" with Colon.  During one recorded exchange, Colon initially balked at a request by Rojas to provide him with drugs "on credit."  Gov't App. at 694 (government trial exhibit 35A).  Rojas implored: "Come on, Anthony, this is me."  Gov't App. at 694 (government trial exhibit 35A).  The transaction was eventually

18

accomplished. Gov't App. at 694-95 (government trial exhibit 35A). The evidence revealed that Rojas regarded himself as more than a mere buyer. He referred to himself as Colon's partner, and even took it upon himself to protect Colon's apartment from intruders while Colon was away. Trial Tr. 356:12, 355:7-25, May 13, 2008.

The fact that Colon provided Rojas with bail money also lends credence to the jury's determination that Colon and Rojas were co-conspirators, involved in a mutually beneficial relationship. Just as the provision of drugs on credit may "reflect the kind of trust," Gibbs, 190 F.3d at 200, often present between co-conspirators, so too can the provision of bail money. Indeed, it evinces Colon's "shared stake" in Rojas's "illegal venture." United States v. Contreras, 249 F.3d 595, 599 (7th Cir. 2001) (internal quotation marks omitted).

As was the case in United States v. Hawkins, "the evidence [presented at trial] clearly establishe[d] that [Rojas] intended to redistribute some of the [crack] cocaine

he purchased" from Colon for profit. 547 F.3d at 75. In fact, Colon testified that he sold drugs to Rojas "on credit" because he knew that Rojas would resell a portion of those drugs. Trial Tr. 291:13-20, May 13, 2008. Rojas argues that his only object in reselling the drugs he obtained from Colon was to make money to feed his addition, and not to further the ends of the conspiracy. However, as the government notes before this Court, the manner in which Rojas chose to spend the profits he obtained from his participation in the conspiracy is of no legal significance to our evaluation of whether the evidence was sufficient to establish more than a buyer-seller relationship.

In his testimony at trial, Colon identified the defendant as one of the individuals who was buying larger quantities of drugs from him. Trial Tr. 289:7-9, May 13, 2008. The jury could draw a reasonable inference from the quantity of drugs purchased by Rojas that they were not all for individual consumption. For example, in one intercepted call, which was played at trial, Rojas asked Colon to

"[f]ront him seven grams of crack cocaine." Trial Tr. 334:10, May 13, 2008. According to Colon's testimony, Rojas assured him that he would be able to pay him back "[a]t the end of the night." Trial Tr. 334:12, May 13, 2008. Colon explained that he understood that, in order for Rojas to pay him back, Rojas would have to resell the drugs.

In a recorded phone call played at trial, Colon told Rojas that he would "always look out for [him]" because Rojas "look[ed] out for [Colon]." Gov't App. at 720 (government trial exhibit 45A). Further, Rojas assured Colon: "when I deal, then I come through." Gov't App. at 721 (government trial exhibit 45A). The jury could properly have considered this assurance of reliability as evidence of a conspiracy. See United States v. Miranda-Ortiz, 926 F.2d 172, 176 (2d Cir. 1991). This is so especially in light of the fact that Colon and Rojas had a longstanding relationship. See Contreras, 249 F.3d at 599; see also Wexler, 522 F.3d at 211 (Raggi, J., dissenting).

In sum, we conclude that sufficient evidence supported

21

the jury's verdict.  The jury could reasonably have relied on evidence presented at trial that demonstrated a lengthy affiliation between Colon and Rojas, evidence that demonstrated mutual trust between the defendant and Colon, the presence of sales "on credit," the quantity of drugs involved, and the fact that Colon bailed Rojas out of jail on multiple occasions, to conclude that Colon and Rojas were co-conspirators and that their relationship was not that of a mere buyer and a seller.  See Gibbs, 190 F.3d at 199-200.

B.   Recalling the "Discharged" Jury

Defendant's second contention on appeal presents this Court with a question that we have never before had occasion to answer: may a district court recall a jury that has been declared "discharged," but which has not dispersed, to re-read a verdict form when the courtroom deputy's initial reading did not conform to the written verdict?  We find, based on the facts and circumstances of this case, that no error was committed by the district court.

We review de novo a district court's interpretation of

22

the Federal Rules of Criminal Procedure.  Cf. United States v. Camacho, 370 F.3d 303, 305 (2d Cir. 2004).  We consider the question of which verdict controls — the written or the oral verdict — to be a question of law, which is also subject to de novo review.  See United States v. Boone, 951 F.2d 1526, 1532 (9th Cir. 1991).

In framing his argument that the district court erred in recalling the jury, the defendant relies on Federal Rule of Criminal Procedure 31(d), which provides:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually.  If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

Fed. R. Crim. P. 31(d).  We conclude that this rule does not prevent the district court from returning a jury, which has not left the deliberation room, to the courtroom when it becomes clear that the deputy erred in reciting the written verdict.  The mere incantation of the word "discharged" marks only a time when the jurors have been discharged

23

nominally.  The court must evaluate the specific scenario presented in order to determine whether recalling the jury would result in prejudice to the defendant or undermine the confidence of the court — or of the public — in the verdict. In this case, notwithstanding the fact that the jury assented to the improperly read verdict form when polled for the first time, the initial misreading of the written verdict form in no way calls into doubt our conclusion that the actual verdict reached by the jury is reflected in the written form.  Nor does the recitation error leave us with any uncertainty that the written verdict form reflects an uncoerced and unanimous jury verdict.

The government relies heavily on a 1926 decision of the Fourth Circuit Court of Appeals, Summers v. United States, 11 F.2d 583 (4th Cir. 1926), which we find instructive.  In that case, the court held:

> [A jury] may remain undischarged and retain
> its functions, though discharge may have
> been spoken by the court, if, after such
> announcement, it remains an undispersed
> unit, within [the] control of the court,
> with no opportunity to mingle with or

24

> discuss the case with others, and particularly where, as here, the very case upon which it has been impaneled is still under discussion by the court, without the intervention of any other business.

Id. at 586. We agree that under the circumstances described by the Summers court — also present in this case — a jury may properly be returned to the courtroom to correct a technical error that occurred during the initial reading of its written verdict.[2] We find that the written verdict form reflects the operative verdict in this case. The jury assented to the corrected reading of its verdict in open court, and it is therefore a wholly reliable indicator of the jury's true verdict. The deputy's inadvertent omission of the word "base" when reading the verdict initially does not require vacatur of the conviction under these

---

[2] In referring to the error in the deputy's reading of the verdict as "technical," we do not mean to suggest that the distinction between a cocaine offense and a cocaine base offense is not a substantive one. Rather, we mean that the misreading itself was a technical error. Furthermore, as noted by the district court, the actual underlying count of conviction refers to "a controlled substance," 21 U.S.C. § 841(a)(1), and this portion of the verdict form was read properly.

25

circumstances.

The re-reading of the written verdict form, and re-polling of the jury, as conducted in this case, is distinguishable from a case in which jury deliberations are reopened.  See United States v. Kress, 58 F.3d 370, 372 (8th Cir. 1995).  Here, the district court simply reconvened the jury to correct a technical error in the courtroom deputy's reading of the verdict form.  We can be confident that no further deliberation took place between the initial discharging of the jury and minutes later when it was reassembled in the courtroom.  The most logical conclusion that can be drawn from the record is that the members of the jury were unaware that the oral recitation of their verdict was not in conformance with the written verdict until they were returned to the courtroom by the district judge.[3]

---

[3] We do not decide whether a different outcome would result if the jury was asked to do anything beyond clarify what it had previously decided.  It might be that reassembling a jury after it has dispersed, and after a significant amount of time has passed, could pose "manifest difficulties," Harrison v. Gillespie, 596 F.3d 551, 574 (9th Cir. 2010) (internal quotation marks omitted), but we are not now faced with such a scenario.  In the instant case,

26

It is significant that, although the jury had technically been declared "discharged" by the court, it had not dispersed.[4] The jurors were therefore not exposed to "outside factors," which might "render[] the reliability of any poll on recall problematic." United States v. Marinari, 32 F.3d 1209, 1213 (7th Cir. 1994). In accord with the Summers court, the Seventh Circuit has held that "[w]hen a jury remains as an undispersed unit within the control of the court and with no opportunity to mingle with or discuss the case with others, it is undischarged and may be recalled." Id. at 1214. Similarly, we hold that the jury in this case "retain[ed] its function[]," Summers, 11 F.2d at 586, and that it was proper to return it to the courtroom for a re-reading of the verdict form and for a re-polling.

---

the government maintains — and there is nothing in the record to contradict this assertion — that the district court was informed of the error within six minutes of pronouncing the jury "discharged."

[4] We leave for another day the question of the legitimacy of a verdict when a technical misreading of a written verdict form is not discovered until after the jury has dispersed.

Based on the totality of the circumstances of this case, there can be no doubt that the jury intended to convict Rojas of an offense involving cocaine base. The evidence at trial centered on defendant's sale of cocaine base, the defendant was charged in a conspiracy to distribute cocaine base, the court's instructions to the jury referred to a crime involving cocaine base, and the written verdict form required the jury to make specific findings as to the amount of cocaine base involved in defendant's crime. Indeed, in re-polling the jury after the error was detected as to the reading of the telephone counts, the district court specifically stated that it wanted to "ensure that [its] verdict is as to cocaine base and not as to cocaine."[5] Trial Tr. 698:1-2, May 14, 2008.

---

[5] Although we find that the district court did not err, even if we were to accept defendant's contention that the recalling and re-polling of the jury was error, it would clearly be harmless under the circumstances. See United States v. Yousef, 327 F.3d 56, 121 (2d Cir. 2003). Federal Rule of Criminal Procedure 52(a) states:

> Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

28

The fact that the jury originally assented to the misread version of its verdict does not alter our holding:

> To conclude that the jury agreed with the [deputy's] mistaken reading of the verdict, rather than the jury's written verdict, requires us to assume that the jurors unanimously changed their minds in a split second . . . . It is unreasonable to expect the jurors to have corrected the [deputy's] misreading of their verdict and to conclude that by their failure to do so [they had] assented to the misread verdict[].

Boone, 951 F.2d at 1532. As we have previously explained, the "purpose of a jury poll is to test the uncoerced unanimity of the verdict by requiring each juror to answer for himself [or herself], thus creating individual responsibility." United States v. Gambino, 951 F.2d 498, 502 (2d Cir. 1991) (internal quotation marks omitted and emphasis added). While it is true that a juror has a right, "when polled, to dissent from a verdict to which he [or she]

---

Fed. R. Crim. P. 52(a). The record demonstrates that the flawed recitation of the jury's written verdict form did not affect the defendant's substantial rights. The defendant suffered no prejudice by the reassembly of the jury.

has agreed in the jury room," Bruce v. Chestnut Farms-Chevy Chase Dairy, 126 F.2d 224, 225 (D.C. Cir. 1942) (per curiam), there is no suggestion that any one of the jurors in fact dissented from the written verdict form. There is nothing in the record to reflect disunity within the jury; nor does the defendant contend that the jury's endorsement of its written verdict upon re-polling was the product of coercion. Rather, the fact that the jury unanimously assented to the corrected reading of its verdict form suggests that it was under the erroneous impression that the original reading accurately reflected its unanimous, written verdict.

Accordingly, there is no merit to the argument that the jury intended to convict Rojas of a cocaine offense, rather than an offense involving cocaine base. Cf. Putnam Res. v. Pateman, 958 F.2d 448, 457 (1st Cir. 1992) (finding "no plausible theory[,] . . . legal or equitable, which could ground an assertion that the jury findings were ambiguous" and "assum[ing] that the jury listened to and understood the

30

court's entire charge" (internal quotation marks omitted)). To find otherwise "would elevate form over substance." Boone, 951 F.2d at 1533. If we were to "conform the written verdict to reflect the misread verdict," it would have the effect of "frustrat[ing] the jury's intent and the entire jury process." Id. We conclude that the written verdict form is operative and that it accurately reflects the jury's true verdict. Therefore, we hold that the district court did not err in recalling the still-assembled jury to correct an inadvertent error in the recitation of the verdict.

### III. CONCLUSION

We have reviewed all of defendant's contentions on appeal and find them to be without merit. Accordingly, the judgment of the district court is hereby AFFIRMED.