(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DIETZ *v*. BOULDIN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 15–458.   Argued April 26, 2016—Decided June 9, 2016

Petitioner Rocky Dietz sued respondent Hillary Bouldin for negligence for injuries suffered in an automobile accident.  Bouldin removed the case to Federal District Court.  At trial, Bouldin admitted liability and stipulated to damages of $10,136 for Dietz' medical expenses. The only disputed issue remaining was whether Dietz was entitled to more.  During deliberations, the jury sent the judge a note asking whether Dietz' medical expenses had been paid and, if so, by whom. Although the judge was concerned that the jury may not have understood that a verdict of less than the stipulated amount would require a mistrial, the judge, with the parties' consent, responded only that the information being sought was not relevant to the verdict.  The jury returned a verdict in Dietz' favor but awarded him $0 in damages.

   After the verdict, the judge discharged the jury, and the jurors left the courtroom.  Moments later, the judge realized the error in the $0 verdict and ordered the clerk to bring back the jurors, who were all in the building—including one who may have left for a short time and returned.  Over the objection of Dietz' counsel and in the interest of judicial economy and efficiency, the judge decided to recall the jury. After questioning the jurors as a group, the judge was satisfied that none had spoken about the case to anyone and ordered them to return the next morning.  After receiving clarifying instructions, the reassembled jury returned a verdict awarding Dietz $15,000 in damages.  On appeal, the Ninth Circuit affirmed.

*Held*: A federal district court has a limited inherent power to rescind a jury discharge order and recall a jury in a civil case for further deliberations after identifying an error in the jury's verdict.  The District Court did not abuse that power here.  Pp. 4–13.

   (a) The inherent powers that district courts possess "to manage

their own affairs so as to achieve the orderly and expeditious disposi-
tion of cases," *Link* v. *Wabash R. Co.*, 370 U. S. 626, 630–631, have
certain limits. The exercise of an inherent power must be a "reason-
able response to the problems and needs" confronting the court's fair
administration of justice and cannot be contrary to any express grant
of, or limitation on, the district court's power contained in a rule or
statute. *Degen* v. *United States*, 517 U. S. 820, 823–824. These two
principles support the conclusion here.

First, rescinding a discharge order and recalling the jury can be a
reasonable response to correcting an error in the jury's verdict in cer-
tain circumstances, and is similar in operation to a district court's
express power under Federal Rule of Civil Procedure 51(b)(3) to give
the jury a curative instruction and order them to continue deliberat-
ing to correct an error in the verdict before discharge. Other inherent
powers possessed by district courts, *e.g.*, a district court's inherent
power to modify or rescind its orders before final judgment in a civil
case, see *Marconi Wireless Telegraph Co. of America* v. *United States*,
320 U. S. 1, 47–48, or to manage its docket and courtroom with a
view toward the efficient and expedient resolution of cases, see *Lan-
dis* v. *North American Co.*, 299 U. S. 248, 254, also support this con-
clusion.

Second, rescinding a discharge order to recall a jury does not vio-
late any other rule or statute. No implicit limitation in Rule 51(b)(3)
prohibits a court from rescinding its discharge order and reassem-
bling the jury. Nor are such limits imposed by other rules dealing
with postverdict remedies. See, *e.g.*, Fed. Rules Civ. Proc. 50(b),
59(a)(1)(A). Pp. 4–7.

(b) This inherent power must be carefully circumscribed, especially
in light of the guarantee of an impartial jury. Because discharge re-
leases a juror from the obligations to avoid discussing the case out-
side the jury room and to avoid external prejudicial information, the
potential that a jury reassembled after being discharged might be
tainted looms large. Thus, any suggestion of prejudice should counsel
a district court not to exercise its inherent power. The court should
determine whether any juror has been directly tainted and should al-
so take into account additional factors that can indirectly create prej-
udice, which at a minimum, include the length of delay between dis-
charge and recall, whether the jurors have spoken to anyone about
the case after discharge, and any emotional reactions to the verdict
witnessed by the jurors. Courts should also ask to what extent just-
dismissed jurors accessed their smartphones or the internet.

Applying those factors here, the District Court did not abuse its
discretion. The jury was out for only a few minutes, and, with the ex-
ception of one juror, remained inside the courthouse. The jurors did

Syllabus

not speak to any person about the case after discharge.  And, there is no indication in the record that the verdict generated any kind of emotional reaction or electronic exchanges or searches that could have tainted the jury.  Pp. 7–10.

(c) Dietz' call for a categorical bar on reempaneling a jury after discharge is rejected.  Even assuming that at common law a discharged jury could never be brought back, the advent of modern federal trial practice limits the common law's relevance as to the specific question raised here.  There is no benefit to imposing a rule that says that as soon as a jury is free to go a judge categorically cannot rescind that order to correct an easily identified and fixable mistake.  And Dietz' "functional" discharge test, which turns on whether the jurors remain within the district court's "presence and control," *i.e.*, within the courtroom, raises similar problems.  Pp. 11–13.

794 F. 3d 1093; affirmed.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, ALITO, and KAGAN, JJ., joined.  THOMAS, J., filed a dissenting opinion, in which KENNEDY, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–458

ROCKY DIETZ, PETITIONER *v.* HILLARY BOULDIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 9, 2016]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

In this case, a jury returned a legally impermissible verdict. The trial judge did not realize the error until shortly after he excused the jury. He brought the jury back and ordered them to deliberate again to correct the mistake. The question before us is whether a federal district court can recall a jury it has discharged, or whether the court can remedy the error only by ordering a new trial.

This Court now holds that a federal district court has the inherent power to rescind a jury discharge order and recall a jury for further deliberations after identifying an error in the jury's verdict. Because the potential of tainting jurors and the jury process after discharge is extraordinarily high, however, this power is limited in duration and scope, and must be exercised carefully to avoid any potential prejudice.

I

Petitioner Rocky Dietz was driving through an intersection in Bozeman, Montana, when Hillary Bouldin ran the red light and T-boned Dietz. As a result of the accident, Dietz suffered injuries to his lower back that caused him

severe pain. He sought physical therapy, steroid injec-
tions, and other medications to treat his pain. Dietz sued
Bouldin for negligence. Bouldin removed the case to
Federal District Court. See 28 U. S. C. §§1332, 1441.

At trial, Bouldin admitted that he was at fault for the
accident and that Dietz was injured as a result. Bouldin
also stipulated that Dietz' medical expenses of $10,136
were reasonable and necessary as a result of the collision.
The only disputed issue at trial for the jury to resolve was
whether Dietz was entitled to damages above $10,136.

During deliberations, the jury sent the judge a note
asking: "'Has the $10,136 medical expenses been paid; and
if so, by whom?'" App. 36. The court discussed the note
with the parties' attorneys and told them he was unsure
whether the jurors understood that their verdict could not
be less than that stipulated amount, and that a mistrial
would be required if the jury did not return a verdict of at
least $10,136. The judge, however, with the consent of
both parties, told the jury that the information they
sought was not relevant to the verdict.

The jury returned a verdict in Dietz' favor but awarded
him $0 in damages. The judge thanked the jury for its
service and ordered them "discharged," telling the jurors
they were "free to go." App. to Pet. for Cert. 25a. The
jurors gathered their things and left the courtroom.

A few minutes later, the court ordered the clerk to bring
the jurors back. Speaking with counsel outside the jury's
presence, the court explained that it had "just stopped the
jury from leaving the building," after realizing that the $0
verdict was not "legally possible in view of stipulated
damages exceeding $10,000." *Id.,* at 26a. The court sug-
gested two alternatives: (1) order a new trial or (2)
reempanel the jurors, instructing them to award at least
the stipulated damages, and ordering them to deliberate
anew.

Dietz' attorney objected to reempaneling the discharged

jurors, arguing that the jury was no longer capable of returning a fair and impartial verdict. The court reiterated that none of the jurors had left the building, and asked the clerk whether any had even left the floor where the courtroom was located. The clerk explained that only one juror had left the building to get a hotel receipt and bring it back.

Before the jurors returned, the judge told the parties that he planned to order the jury to deliberate again and reach a different verdict. The judge explained that he would "hate to just throw away the money and time that's been expended in this trial." *Id.,* at 28a. When the jurors returned to the courtroom, the judge questioned them as a group and confirmed that they had not spoken to anyone about the case.

The judge explained to the jurors the mistake in not awarding the stipulated damages. He informed the jurors that he was reempaneling them and would ask them to start over with clarifying instructions. He asked the jurors to confirm that they understood their duty and to return the next morning to deliberate anew. The next day, the reassembled jury returned a verdict awarding Dietz $15,000 in damages.

On appeal, the Ninth Circuit affirmed. 794 F. 3d 1093 (2015). The court held that a district court could reempanel the jury shortly after dismissal as long as during the period of dismissal, the jurors were not exposed to any outside influences that would compromise their ability to reconsider the verdict fairly. This Court granted Dietz' petition for a writ of certiorari to resolve confusion in the Courts of Appeals on whether and when a federal district court has the authority to recall a jury after discharging it. 577 U. S. ___ (2016). See *Wagner* v. *Jones*, 758 F. 3d 1030, 1034–1035 (CA8 2014), cert. denied, 575 U. S. ___ (2015); *United States* v. *Figueroa*, 683 F. 3d 69, 72–73 (CA3 2012); *United States* v. *Rojas*, 617 F. 3d 669,

677–678 (CA2 2010); *United States* v. *Marinari*, 32 F. 3d 1209, 1214 (CA7 1994); *Summers* v. *United States*, 11 F. 2d 583, 585–587 (CA4 1926).

## II

## A

The Federal Rules of Civil Procedure set out many of the specific powers of a federal district court. But they are not all encompassing. They make no provision, for example, for the power of a judge to hear a motion *in limine*,[1] a motion to dismiss for *forum non conveniens*,[2] or many other standard procedural devices trial courts around the country use every day in service of Rule 1's paramount command: the just, speedy, and inexpensive resolution of disputes.

Accordingly, this Court has long recognized that a district court possesses inherent powers that are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link* v. *Wabash R. Co.*, 370 U. S. 626, 630–631 (1962); see also *United States* v. *Hudson*, 7 Cranch 32, 34 (1812). Although this Court has never precisely delineated the outer boundaries of a district court's inherent powers, the Court has recognized certain limits on those powers.

First, the exercise of an inherent power must be a "reasonable response to the problems and needs" confronting the court's fair administration of justice. *Degen* v. *United States*, 517 U. S. 820, 823–824 (1996). Second, the exercise of an inherent power cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute. See *id.,* at 823; Fed. Rule Civ. Proc. 83(b) (districts courts can "regulate [their] prac-

———————————

[1] *Luce* v. *United States*, 469 U. S. 38, 41, n. 4 (1984).
[2] *Gulf Oil Corp.* v. *Gilbert*, 330 U. S. 501, 507–508 (1947).

tice in any manner consistent with federal law"); see, *e.g., Bank of Nova Scotia* v. *United States*, 487 U. S. 250, 254 (1988) (holding that a district court cannot invoke its inherent power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)). These two principles—an inherent power must be a reasonable response to a specific problem and the power cannot contradict any express rule or statute—support the conclusion that a district judge has a limited inherent power to rescind a discharge order and recall a jury in a civil case where the court discovers an error in the jury's verdict.

First, rescinding a discharge order and recalling the jury can be a reasonable response to correcting an error in the jury's verdict in certain circumstances. In the normal course, when a court recognizes an error in a verdict before it discharges the jury, it has the express power to give the jury a curative instruction and order them to continue deliberating. See Fed. Rule Civ. Proc. 51(b)(3) ("The court . . . may instruct the jury at any time before the jury is discharged"); 4 L. Sand et al., Modern Federal Jury Instructions–Civil ¶78.01, Instruction 78–10, p. 78–31 (2015) (Sand) (when a jury returns an inconsistent verdict, "[r]esubmitting the verdict . . . to resolve the inconsistencies is often the preferable course"). The decision to recall a jury to give them what would be an identical predischarge curative instruction could be, depending on the circumstances, similarly reasonable.

This conclusion is buttressed by this Court's prior cases affirming a district court's inherent authority in analogous circumstances. For example, the Court has recognized that a district court ordinarily has the power to modify or rescind its orders at any point prior to final judgment in a civil case. *Marconi Wireless Telegraph Co. of America* v. *United States*, 320 U. S. 1, 47–48 (1943); see also Fed. Rule Civ. Proc. 54(b) (district court can revise partial final

judgment order absent certification of finality); *Fernandez* v. *United States*, 81 S. Ct. 642, 644, 5 L. Ed. 2d 683 (1961) (Harlan, J., in chambers) (district court has inherent power to revoke order granting bail).

Here, the District Court rescinded its order discharging the jury before it issued a final judgment. Rescinding the discharge order restores the legal status quo before the court dismissed the jury. The District Court is thus free to reinstruct the jury under Rule 51(b)(3).

This Court has also held that district courts have the inherent authority to manage their dockets and court-rooms with a view toward the efficient and expedient resolution of cases. See, *e.g., Landis* v. *North American Co.*, 299 U. S. 248, 254 (1936) (district court has inherent power to stay proceedings pending resolution of parallel actions in other courts); *Link*, 370 U. S., at 631–632 (district court has inherent power to dismiss case *sua sponte* for failure to prosecute); *Chambers* v. *NASCO, Inc.*, 501 U. S. 32, 44 (1991) (district court has inherent power to vacate judgment procured by fraud); *United States* v. *Morgan*, 307 U. S. 183, 197–198 (1939) (district court has inherent power to stay disbursement of funds until revised payments are finally adjudicated).

This Court's recognition of these other inherent powers designed to resolve cases expeditiously is consistent with recognizing an inherent power to recall a discharged jury and reempanel the jurors with curative instructions. Compared to the alternative of conducting a new trial, recall can save the parties, the court, and society the costly time and litigation expense of conducting a new trial with a new set of jurors.

Second, rescinding a discharge order to recall a jury does not violate any other rule or statute. Rule 51(b)(3) states that a court "may instruct the jury at any time before the jury is discharged." A judge obviously cannot instruct a jury that is discharged—it is no longer there.

But there is no implicit limitation in Rule 51(b)(3) that prohibits a court from rescinding its discharge order and reassembling the jury. See *Link*, 370 U. S., at 630 (holding that Rule 41(b)'s allowance for a party to move to dismiss for failure to prosecute did not implicitly abrogate the court's power to dismiss *sua sponte*). Other rules dealing with postverdict remedies such as a motion for a new trial or a motion for judgment notwithstanding the verdict, see Fed. Rules Civ. Proc. 50(b), 59(a)(1)(A), similarly do not place limits on a court's ability to rescind a prior order discharging a jury. Accordingly, a federal district court can rescind a discharge order and recall a jury in a civil case as an exercise of its inherent powers.

B

Just because a district court has the inherent power to rescind a discharge order does not mean that it is appropriate to use that power in every case. Because the exercise of an inherent power in the interest of promoting efficiency may risk undermining other vital interests related to the fair administration of justice, a district court's inherent powers must be exercised with restraint. See *Chambers*, 501 U. S., at 44 ("Because of their very potency, inherent powers must be exercised with restraint and discretion").

The inherent power to rescind a discharge order and recall a dismissed jury, therefore, must be carefully circumscribed, especially in light of the guarantee of an impartial jury that is vital to the fair administration of justice. This Court's precedents implementing this guarantee have noted various external influences that can taint a juror. *E.g., Remmer* v. *United States*, 347 U. S. 227, 229 (1954) ("In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively preju-

dicial"). Parties can accordingly ask that a juror be excused during trial for good cause, Fed. Rule Civ. Proc. 47(c), or challenge jury verdicts based on improper extraneous influences such as prejudicial information not admitted into evidence, comments from a court employee about the defendant, or bribes offered to a juror, *Warger* v. *Shauers*, 574 U. S. ___, ___ (2014) (slip op., at 10) (citing *Tanner* v. *United States*, 483 U. S. 107, 117 (1987)); see also *Mattox* v. *United States*, 146 U. S. 140, 149–150 (1892) (external prejudicial information); *Parker* v. *Gladden*, 385 U. S. 363, 365 (1966) (*per curiam*) (bailiff comments on defendant); *Remmer*, 347 U. S., at 228–230 (bribe offered to juror).

The potential for taint looms even larger when a jury is reassembled after being discharged. While discharged, jurors are freed from instructions from the court requiring them not to discuss the case with others outside the jury room and to avoid external prejudicial information. See, *e.g.,* 4 Sand ¶71.02 (standard instruction to avoid extraneous influences); see also *id.,* ¶71.01, Instructions 71–12 to 71–14 (avoid publicity). For example, it is not uncommon for attorneys or court staff to talk to jurors postdischarge for their feedback on the trial. See 1 K. O'Malley et al., Federal Jury Practice and Instructions §9:8 (6th ed. 2006) (debating appropriateness of practice).

Any suggestion of prejudice in recalling a discharged jury should counsel a district court not to exercise its inherent power. A district court that is considering whether it should rescind a discharge order and recall a jury to correct an error or instead order a new trial should, of course, determine whether any juror has been directly tainted—for example, if a juror discusses the strength of the evidence with nonjurors or overhears others talking about the strength of the evidence. But the court should also take into account at least the following additional factors that can indirectly create prejudice in this context,

any of which standing alone could be dispositive in a particular case.

First, the length of delay between discharge and recall. The longer the jury has been discharged, the greater the likelihood of prejudice. Freed from the crucible of the jury's group decisionmaking enterprise, discharged jurors may begin to forget key facts, arguments, or instructions from the court. In taking off their juror "hats" and returning to their lives, they may lose sight of the vital collective role they played in the impartial administration of justice. And they are more likely to be exposed to potentially prejudicial sources of information or discuss the case with others, even if they do not realize they have done so or forget when questioned after being recalled by the court. How long is too long is left to the discretion of the district court, but it could be as short as even a few minutes, depending on the case.

Second, whether the jurors have spoken to anyone about the case after discharge. This could include court staff, attorneys and litigants, press and sketch artists, witnesses, spouses, friends, and so on. Even apparently innocuous comments about the case from someone like a courtroom deputy such as "job well done" may be sufficient to taint a discharged juror who might then resist reconsidering her decision.

Third, the reaction to the verdict. Trials are society's way of channeling disputes into fair and impartial resolutions. But these disputes can be bitter and emotional. And, depending on the case, those emotions may be broadcasted to the jury in response to their verdict. Shock, gasps, crying, cheers, and yelling are common reactions to a jury verdict—whether as a verdict is announced in the courtroom or seen in the corridors after discharge.

In such a case, there is a high risk that emotional reactions will cause jurors to begin to reconsider their decision and ask themselves, "Did I make the right call?" Of

course, this concern would be present even in a decision to reinstruct the jury to fix an error after the verdict is announced but before they are discharged. See Fed. Rule Civ. Proc. 51(b)(3). Even so, after discharging jurors from their obligations and the passage of time, a judge should be reluctant to reempanel a jury that has witnessed emotional reactions to its verdict.

In considering these and any other relevant factors, courts should also ask to what extent just-dismissed jurors accessed their smartphones or the internet, which provide other avenues for potential prejudice. It is a now-ingrained instinct to check our phones whenever possible. Immediately after discharge, a juror could text something about the case to a spouse, research an aspect of the evidence on Google, or read reactions to a verdict on Twitter. Prejudice can come through a whisper or a byte.

Finally, we caution that our recognition here of a court's inherent power to recall a jury is limited to civil cases only. Given additional concerns in criminal cases, such as attachment of the double jeopardy bar, we do not address here whether it would be appropriate to recall a jury after discharge in a criminal case. See *Smith* v. *Massachusetts*, 543 U. S. 462, 473–474 (2005).

Applying these factors, the District Court here did not abuse its discretion by rescinding its discharge order and recalling the jury to deliberate further. The jury was out for only a few minutes after discharge. Only one juror may have left the courthouse, apparently to retrieve a hotel receipt. The jurors did not speak to any person about the case after discharge. There is no indication in the record that this run-of-the-mill civil case—where the parties agreed that the defendant was liable and disputed damages only—generated any kind of emotional reaction or electronic exchanges or searches that could have tainted the jury. There was no apparent potential for prejudice by recalling the jury here.

### III

Dietz asks us to impose a categorical bar on reempaneling a jury after it has been discharged. He contends that, at common law, a jury once discharged could never be brought back together again. Accordingly, he argues, without a "'long unquestioned' power" of courts recalling juries, a federal district court lacks the inherent power to rescind a discharge order. See *Carlisle* v. *United States*, 517 U. S. 416, 426–427 (1996) (district court lacked inherent authority to grant untimely motion for judgment of acquittal).

We disagree. Even assuming that the common-law tradition is as clear as Dietz contends, but see, *e.g., Prussel* v. *Knowles*, 5 Miss. 90, 95–97 (1839) (allowing postdischarge recall), the common law is less helpful to understanding modern civil trial practice. At common law, any error in the process of rendering a verdict, no matter how technical or inconsequential, could be remedied only by ordering a new trial. But modern trial practice did away with this system, replacing it with the harmless-error standard now embodied in Rule 61. See *Kotteakos* v. *United States*, 328 U. S. 750, 758, 760 (1946) (recognizing predecessor statute to Rule 61 codified the "salutary policy" of "substitu[ing] judgment for automatic . . . rules").

Jury practice itself no longer follows the strictures of the common law. The common law required that juries be sequestered from the rest of society until they reached a verdict. Tellier, Separation or Dispersal of Jury in Civil Case After Submission, 77 A. L. R. 2d 1086 (1961). This generally meant no going home at night, no lunch breaks, no dispersing at all until they reached a verdict. *Id.,* §2; see also *Lester* v. *Stanley*, 15 F. Cas. 396, 396–397 (No. 8,277) (Conn. 1808) (Livingston, Circuit Justice) (following common law). Courts are no longer required to impose these requirements on juries in order to prevent possible prejudice. See *Nebraska Press Assn.* v. *Stuart*, 427 U. S.

539, 554 (1976) (cases requiring sequestration to avoid trial publicity "are relatively rare"); *Drake* v. *Clark*, 14 F. 3d 351, 358 (CA7 1994) ("Sequestration is an extreme measure, one of the most burdensome tools of the many available to assure a fair trial"). Accordingly, while courts should not think they are generally free to discover new inherent powers that are contrary to civil practice as recognized in the common law, see *Carlisle*, 517 U. S., at 426–427, the advent of modern federal trial practice limits the common law's relevance as to the specific question whether a judge can recall a just-discharged jury.

Dietz also argues that the nature of a jury's deliberative process means that something about the jury is irrevocably broken once the jurors are told they are free to go. According to Dietz, with their bond broken, the jurors cannot be brought back together again as a "jury." In other words, once a jury is discharged, a court can never put the jury back together again by rescinding its discharge order—legally or metaphysically.

We reject this "Humpty Dumpty" theory of the jury. Juries are of course an integral and special part of the American system of civil justice. Our system cannot function without the dedication of citizens coming together to perform their civic duty and resolve disputes.

But there is nothing about the jury as an entity that ceases to exist simply because the judge tells the jury that they are excused from further service. A discharge order is not a magical invocation. It is an order, like any other order.

And, like any order, it can be issued by mistake. All judges make mistakes. (Even us.) See *Brown* v. *Allen*, 344 U. S. 443, 540 (1953) (Jackson, J., concurring in judgment) ("We are not final because we are infallible, but we are infallible only because we are final"). There is no benefit to imposing a rule that says that as soon as a jury is free to go a judge categorically cannot rescind that order

to correct an easily identified and fixable mistake, even as the jurors are still in the courtroom collecting their things.

Dietz does not suggest the Court adopt a magic-words rule, but instead urges the adoption of a "functional" discharge test based on whether the jurors remain within the "presence and control" of the district court, where control is limited to the courtroom itself. Tr. of Oral Arg. 5–7. Similarly, the dissent suggests that it is the chance "to mingle with bystanders" that creates a discharge that cannot be undone. *Post,* at 1–2 (opinion of THOMAS, J.) (internal quotation marks and brackets omitted). These tests do not avoid the problems that Dietz and the dissent identify with a prejudice inquiry. Under a courtroom test, what if a juror has one foot over the line? What if she just stepped out to use the restroom? Under a courthouse test, what if she is just outside the doors? Reached her car in the parking lot? Under a bystander test, is a courtroom deputy in the jury room a mingling bystander? There is no good reason to prefer a test based on geography or identity over an inquiry focused on potential prejudice.

Finally, Dietz argues that the District Court in this case erred by questioning the discharged jurors as a group before reempaneling them instead of questioning each and every juror individually. While individual questioning could be the better practice in many circumstances, Dietz' attorney raised no objection to this part of the court's process. We decline to review this forfeited objection. See Fed. Rule Civ. Proc. 46.

\* \* \*

Federal district courts have a limited inherent power to rescind a discharge order and recall a jury in a civil case. District courts should exercise this power cautiously and courts of appeals should review its invocation carefully. That was done here. The judgment of the Court of Appeals for the Ninth Circuit is therefore

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–458

_____

## ROCKY DIETZ, PETITIONER *v.* HILLARY BOULDIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 9, 2016]

JUSTICE THOMAS, with whom JUSTICE KENNEDY joins, dissenting.

Justice Holmes famously quipped, "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV." The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897). But old rules often stand the test of time because wisdom underlies them. The common-law rule prohibiting a judge from recalling the jury after it is discharged is one such rule. Even though contemporary jurors are not formally sequestered as they were at common law, they are still subject to significant restrictions designed to prevent undue influence. And in today's world of cellphones, wireless Internet, and 24/7 news coverage, the rationale that undergirds the bright-line rule supplied by the common law is even more relevant: Jurors may easily come across prejudicial information when, after trial, the court lifts their restrictions on outside information. I would therefore hew to that rule rather than adopt the majority's malleable multifactor test for prejudice. I respectfully dissent.

At common law, once the judge discharged the jury and the jury could interact with the public, the judge could not recall the jury to amend the verdict. See *Sargent* v. *State*, 11 Ohio 472, 473 (1842); *Mills* v. *Commonwealth*, 34 Va. 751, 752 (1836); *Little* v. *Larrabee*, 2 Me. 37, 40 (1822). It was not "'the mere announcement'" that the jury was

discharged, but rather the chance to "'mingl[e] with the bystanders'" that triggered the prohibition against re-calling them. *Summers* v. *United States*, 11 F. 2d 583, 586 (CA4 1926) (quoting A. Abbott, A Brief for the Trial of Criminal Cases 730 (2d ed. 1902)). At that point, the court could not fix a substantive error made by the jury, includ-ing "returning a verdict against the *wrong party*; or, if not so, for a *larger* or *smaller* sum than they intended." *Little*, *supra*, at 39; see also *Jackson* v. *Williamson*, 2 T. R. 281, 281–282, 100 Eng. Rep. 153 (K. B. 1788) (refusing to allow an amendment to the verdict after the jury was discharged even though all jurors signed an affidavit explaining that they intended to award more in damages).*

The theory underpinning this rule was simple: Jurors, as the judges of fact, must avoid the possibility of preju-dice. They have long been prohibited from having *ex parte* communications with the parties during a trial or receiv-ing evidence in private. 3 W. Blackstone, Commentaries *375–*376. But once the jury is discharged, the jurors "become accessible to the parties and subject to their influence." *Little*, *supra*, at 39. In drawing the line at the *opportunity* to mingle, the common-law rule was prophy-lactic. But that is a desirable feature when public confi-dence in the judicial system is at stake.

It is true, as the Court explains, that jurors are no longer sequestered from the public. *Ante,* at 11. But remnants of sequestration remain. Jurors are prohibited from *ex parte* contact with the parties and the judge. They are not allowed to gather outside information about the case. And, courthouses have private rooms for jurors, to shield them from *ex parte* information during recesses and deliberations.

_____

*Although courts could not fix substantive errors by recalling the jury, they could correct clerical errors in the reporting of the verdict. See *Little* v. *Larrabee*, 2 Me. 37, 38 (1822).

Even without full sequestration, the common-law rule remains sensible and administrable. After discharge, the court has no power to impose restrictions on jurors, and jurors are no longer under oath to obey them. Jurors may access their cellphones and get public information about the case. They may talk to counsel or the parties. They may overhear comments in the hallway as they leave the courtroom. And they may reflect on the case—away from the pressure of the jury room—in a way that could induce them to change their minds. The resulting prejudice can be hard to detect. And a litigant who suddenly finds himself on the losing end of a materially different verdict may be left to wonder what may have happened in the interval between the jury's discharge and its new verdict. Granting a new trial may be inconvenient, but at least litigants and the public will be more confident that the verdict was not contaminated by improper influence after the trial has ended. And under this bright-line rule, district courts would take greater care in discharging the jury.

In contrast, the only thing that is clear about the majority's multifactor test is that it will produce more litigation. This multifactor test may aid in identifying relevant facts for analysis, but—like most multifactor tests—it leaves courts adrift once those facts have been identified. The majority instructs district judges to look at "the length of delay between discharge and recall," "whether the jurors have spoken to anyone about the case after discharge," "the reaction to the verdict," and whether jurors have had access to their cellphones or the Internet. *Ante,* at 9–10. But in collecting these factors, the majority offers little guidance on how courts should apply them. Is one hour too long? How about two hours or two days? Does a single Internet search by a juror preclude recalling the entire jury? How many factors must be present to shift the balance against recalling the jury? All the majority says is

that any factor "standing alone *could* be dispositive in a particular case." *Ante,* at 8–9 (emphasis added).

The majority's factors thus raise more questions than they answer. Parties will expend enormous effort litigating and appealing these questions. And when the Courts of Appeals inevitably fail to agree on what constitutes prejudice, we will be called on again to sort it out. As the Court of King's Bench recognized over two centuries ago, "it was better that the present plaintiff should suffer an inconvenience" than to head down this murky path. *Jackson*, *supra,* at 282, 100 Eng. Rep., at 153.

All rules have their drawbacks. The common-law rule, on occasion, may unnecessarily force a district court to redo a trial for a minor substantive mistake in the verdict. But the majority's multifactor test will only create more confusion. It would be much simpler to instruct the district courts, when they find a mistake in the verdict after the jury is dismissed, to hold a new trial.

The jurors here had the chance to mingle with the outside world after the District Court's discharge order released them from their oaths. After the announcement of discharge, the jurors entered public spaces in which interaction with nonjurors was possible. At that point, the jurors no longer were within the court's control and, therefore, were in fact discharged. Although the record does not indicate one way or the other, it is also possible that the jurors had access to cellphones or other wireless devices in circumstances where they understood themselves to have been released from any directions or limitations the judge had imposed on the use of those devices during trial.

Because the District Court reconvened the jury after discharge to deliberate anew, I would reverse the Court of Appeals' judgment affirming the verdict and remand for a new trial. I respectfully dissent.