ACCEPTED
04-17-00626-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
9/27/2017 2:45 PM

## No. 04-17626 -CV

---

IN THE COURT OF APPEALS
FOR THE FOURTH DISTRICT OF TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
09/27/2017 2:45:25 PM
KEITH E. HOTTLE
CLERK

---

**IN RE SOUTHCROSS ENERGY PARTNERS, GP LLC,** *Relator*

---

From the 229th Judicial District Court of Duval County, Texas
Cause No. DC-16-139
The Honorable Ana Lisa Garza, presiding

---

## PETITION FOR WRIT OF MANDAMUS

---

Wallace B. Jefferson
State Bar No. 00000019
Rachel A. Ekery
State Bar No. 00787424
Nicholas Bacarisse
State Bar No. 24073872
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701
(512) 482-9300
(512) 482-9303 (facsimile)

Thomas C. Wright
State Bar No. 22059400
Jessica Z. Barger
State Bar No. 24032706
E. Marie Jamison
State Bar No. 24044647
Elizabeth H. Rivers
State Bar No. 24052020
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas 77056
713-572-4321
713-527-4320 (facsimile)

*Counsel for Relators*

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

**Relator:**

Southcross Energy Partners, GP LLC

**Relator's Counsel:**

Wallace B. Jefferson
Rachel A. Ekery
Nicholas Bacarisse
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701

Thomas C. Wright
Jessica Z. Barger
E. Marie Jamison
Elizabeth H. Rivers
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, TX 77056

Ernest P. Gieger, Jr.
Brendan P. Doherty
GIEGER, LABORDE & LAPEROUSE, L.L.C.
5151 San Felipe, Suite 750
Houston, Texas 77056

**Real Parties in Interest:**

Ivy Gonzalez, on behalf of M.R. Gonzalez and M.N. Gonzalez, minor children
Amy Gonzalez and Jesus Gonzalez, Sr., as heirs at law of Jesus Gonzalez, Jr.
Rene Elizondo

**Real Parties' Counsel:**

David Rumley
Ross W. Evans

WIGINGTON RUMLEY DUNN & BLAIR, L.L.P.
123 N. Carrizo Street
Corpus Christi, Texas 78401

Mark A. Gonzalez
ATTORNEY AT LAW
924 Leopard Street
Corpus Christi, Texas 78401

Baldemar Gutierrez
J. Javier Gutierrez
Ana Gutierrez Castillo
THE GUTIERREZ LAW FIRM, INC.
700 E. Third St.
Alice, Texas 78332

Russell S. Post
Chad Flores
Mary Kate Raffetto
BECK REDDEN
1221 McKinney, Suite 4500
Houston, Texas 77010-2010

Bryan K. Harris
Kevin W. Liles
Stuart R. White
LILES HARRIS WHITE, PLLC
500 North Water Street, Suite 800
Corpus Christi, Texas 78401-0232

**Respondent:**

Hon. Ana Lisa Garza
229th District Court of Duval County
400 E. Gravis
San Diego, TX 78384

P.O. Box 1070
San Diego, TX 78384

3

**TABLE OF CONTENTS**

Page

IDENTITY OF PARTIES AND COUNSEL ..........................................................2

INDEX OF AUTHORITIES.............................................................................6

STATEMENT OF THE CASE.........................................................................8

STATEMENT OF JURISDICTION...................................................................10

STATEMENT REGARDING ORAL ARGUMENT .............................................11

REQUEST FOR TEMPORARY EMERGENCY RELIEF ...................................12

ISSUES PRESENTED..................................................................................13

PRELIMINARY STATEMENT ......................................................................15

STATEMENT OF FACTS .............................................................................16

A.          The jury trial, charge of the court, and first verdict. ...........................16

B.          Discharged jurors talk with the lawyers about the verdict and damages award. ...............................................................18

C.          The trial court orders jurors back to the courthouse, the jurors further discuss the verdict in the jury room, and the court accepts evidence that impeaches the verdict's damages award. ...............................................................19

D.          The trial court orders the jury to redeliberate, allows the jury to render a second verdict, and then accepts the second verdict................................................................20

SUMMARY OF THE ARGUMENT ................................................................22

ARGUMENT..............................................................................................23

I.          The trial court's decision to reconvene the jury and receive evidence to impeach the jury's verdict, and allow that same jury to redeliberate was arbitrary and unreasonable. .................23

A.       Trial courts are prohibited from reconvening jurors after they have been discharged and intermingled with the public...........................................23

B.       Trial courts are expressly prohibited under Rule of Evidence 606 from receiving evidence to invalidate a jury verdict after the verdict has been accepted. ................................26

C.       Allowing the "jury" to redeliberate and accepting a second verdict is a clear abuse of discretion warranting mandamus....................29

II.       The trial court's actions undermining the jury's initial, sworn verdict were an abuse of discretion. The initial verdict was complete, fully responsive to the questions in the charge, and not conflicting. ...........................................30

III.       There is no adequate remedy by appeal. ...............................................34

CONCLUSION ....................................................................................................37

RULE 52.3(J) CERTIFICATION...........................................................................39

CERTIFICATE OF COMPLIANCE.......................................................................39

CERTIFICATE OF SERVICE ...............................................................................40

APPENDIX ............................................................................................................42

# INDEX OF AUTHORITIES

Page

**Cases**

*Adams v. Houston Lighting & Power, Co.*,
314 S.W.2d 826 (Tex. 1958)..................................................................30

*Archer Daniels Midland Co. v. Bohall*,
114 S.W.3d 42 (Tex. App.—Eastland 2003, no pet.) ................................... 30, 32

*Branham v. Brown*,
925 S.W.2d 365 (Tex. App.—Houston [1st Dist.] 1996, no writ).............. passim

*Caylat v. Houston E. & W. Ry. Co.*,
113 Tex. 131, 252 S.W. 478 (Tex. 1923)....................................... 23, 29

*Dietz v. Bouldin*,
136 S.Ct. 1885 (2016) .............................................................. 24, 25

*Dilbeck v. Ideal Bread Co.*,
562 S.W.2d 563 (Tex. Civ. App.—Texarkana 1978, no writ)............................31

*Faulk v. Bluitt*,
211 S.W.3d 418 (Tex. App.—Waco 2006, pet. denied).....................................35

*Ford Motor Co. v. Castillo*,
279 S.W.3d 656 (Tex. 2009)....................................................... 27, 29

*Golden Eagle Archery, Inc. v. Jackson*,
24 S.W.3d 362 (Tex. 2000).........................................................29

*Hyundai Motor Co. v. Vasquez*,
189 S.W.3d 743 (Tex. 2006).........................................................25

*In re Estate of McNutt*,
No. 04–15–00110–CV, 2016 WL 519732 (Tex. App.—San Antonio
Feb. 10, 2016, pet. denied)..................................................................27

*In re Prudential Ins. Co. of Am.*,
148 S.W.3d 124 (Tex. 2004)....................................................... 34, 37

*In re Team Rocket, L.P.*,
256 S.W.3d 257 (Tex. 2008)................................................................37

*In re Toyota Motor Sales, U.S.A., Inc.*,
407 S.W.3d 746 (Tex. 2013)................................................................35

*In re United Servs. Auto. Ass'n*,
307 S.W.3d 299 (Tex. 2010)................................................................34

*McCarty v. Morrison*,
468 S.W.2d 350 (Tex. 1971).................................................................35

*Wilkins v. Methodist Health Care Sys.*,
160 S.W.3d 559 (Tex. 2005)................................................................35

## Statutes

TEX. GOV'T CODE § 22.201.................................................................10

TEX. GOV'T CODE § 22.221.................................................................10

## Rules

TEX. R. APP. P. 39.1 .........................................................................11

TEX. R. CIV. P. 226...........................................................................29

TEX. R. CIV. P. 293...........................................................................35

TEX. R. CIV. P. 294...........................................................................29

TEX. R. CIV. P. 295..................................................................... 24, 32, 33

TEX. R. CIV. P. 300...........................................................................35

TEX. R. CIV. P. 327...........................................................................26

TEX. R. EVID. 606.............................................................................26

**STATEMENT OF THE CASE**

*Nature of the case*:      Plaintiffs/Real Parties in Interest brought this lawsuit against Defendant/Relator Southcross Energy Partners, GP LLC, alleging negligence and gross negligence stemming from a workplace accident. (MR 309–13) After a five-day trial, the jury returned its verdict in open court. (MR 122–27) The trial court polled the jurors, accepted the verdict, released the jurors from their previous instructions, and discharged the jury. (MR 128–34) Thereafter, Plaintiffs' counsel interviewed one or more jurors and then asked the trial court to bring the jurors back to the courthouse from their homes to *redeliberate* because at least one juror mentioned she thought the damages would be multiplied by the court. (MR 186–207) The trial court reconvened the jury, examined the jurors about their deliberative process, accepted jurors' testimony to impeach the verdict, and ordered the jury to redeliberate and render a new verdict, all over the vociferous objections of Southcross's counsel. (MR 236–37) The trial court accepted this second verdict and is considering whether the first or second verdict should be entered as a final judgment as Southcross. (MR 245–46)

*Trial court*:      229th Judicial District Court of Duval County, Texas; Hon. Ana Lisa Garza, presiding.

*Trial court's actions*:      After accepting the initial $31 million verdict and discharging the jury, the trial court, based on ex parte communications between Plaintiffs' counsel and the foreperson, summoned the jury to return to be questioned about their deliberations and the *intent* of their verdict. Through this improper questioning, the jurors indicated that they thought the numbers they wrote down in the charge would be multiplied and prior to the questioning, they spoke about why they were asked to return to the courthouse. Based on this improperly received evidence, the trial court (after being able to discuss the effect of their verdict with Plaintiffs' counsel, the court, and amongst themselves) actually *allowed* the jury to redeliberate and

8

return a second verdict represented by a second set of numbers written next to the original set. (MR 284–302) The trial court accepted this second verdict which increased the first verdict by nearly **$141 million**.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to issue a writ of mandamus when a trial court abuses its discretion. *See* TEX. GOV'T CODE § 22.221(a), 22.002(a). Jurisdiction is proper under section 22.221(b) of the Texas Government Code because the Respondent is a district court judge in Duval County, Texas, which is one of the counties within the Fourth Court of Appeals' district. *Id*. §§ 22.201(f), 22.221(b).

Further, this case is important to the jurisprudence of the state because the trial court's rulings conflict with the decisions of Texas courts of appeals, are contrary to procedural and evidentiary rules, and violate the parties' substantive, constitutional rights. The trial court's rulings reconvening the discharged jury after multiple jurors had communicated with the lawyers on the case, receiving inadmissible evidence to impeach a jury verdict, and allowing a jury to render a second "verdict" violate Texas's long-standing public policy and practice against tainting jury deliberations and verdicts.

**STATEMENT REGARDING ORAL ARGUMENT**

Relator believes that abuse of discretion is apparent from the face of the record, but respectfully requests oral argument because this issues raised are important to the jurisprudence of the State of Texas, and argument may significantly aid the Court in considering the issues presented in this matter. TEX. R. APP. P. 39.1.

**REQUEST FOR TEMPORARY EMERGENCY RELIEF**

As detailed in the separate motion filed with this mandamus petition, Relator asks the Court for a stay of any order or judgment that purports to give any effect to the "second verdict" returned by the improperly re-impaneled jury around 10 p.m. on Friday, September 22, 2017. The need for expedited treatment arises from the fact that the trial court has set a hearing for 9:30 a.m. on Friday, September 29, 2017, to determine whether she will actually enter judgment on this second verdict. Because the "second verdict" is a void result of an unauthorized procedure, Relator respectfully requests that this Court stay the hearing and any action giving effect to it until the Court has an opportunity to rule on this petition for writ of mandamus.

# ISSUES PRESENTED

1. ***The trial court's reassembling of the jury and receiving evidence to impeach the jury's first verdict violates the Rules of Procedure, the Rules of Evidence, and a century of Texas law.*** A trial court abuses its discretion if it reconvenes a jury after jurors have been discharged and have mingled with the lawyers on the case and general public. Here, the trial court ordered the jurors back to the courthouse about an hour after the verdict had been accepted and the jury was discharged. A majority of the jurors had left the courthouse, some jurors had gone home, some to other places, and others talked to Plaintiffs' counsel about the verdict. After being discharged and questioned by Plaintiffs' counsel, the foreperson allegedly informed Plaintiffs' counsel that the verdict was intended to be larger. The trial court, contrary to procedural and evidentiary rules, ordered all jurors to return to the courthouse and thereafter accepted jurors' testimony as competent evidence to impeach the verdict that had been previously accepted by the trial court. The trial court abused its discretion by reconvening the jury and receiving evidence to impeach the validity of the verdict. The jurors' testimony should be disregarded and stricken from the record. The trial court's rulings and actions are a clear abuse of discretion, and the second verdict should also be stricken from the record.[1]

2. ***The trial court abused its discretion in allowing the jury to redeliberate and significantly change its original verdict—after being discharged and mingling with Plaintiffs' counsel.*** After its erroneous questioning of the jurors, the trial court compounded its error by allowing the jury to redeliberate after the first verdict. By recalling the discharged jury and ordering it to deliberate again, the trial court effectively granted a new trial—but then skipped the trial and went right to the verdict. Jurors redeliberated, and rendered a new verdict on only the damage awards. This was a clear abuse of discretion, and mandamus is appropriate.

3. ***The trial court abused its discretion by receiving the second verdict.*** The first verdict was accepted, is complete, and is without "mistake." In this case, Plaintiffs' counsel had no objections to the final jury charge (in fact, the trial court essentially gave Plaintiffs' counsel the charge they wanted). The jury

---

[1] By requesting that the erroneous second verdict be stricken from the record, Relator is not agreeing to the first verdict. Relator reserves all rights to appeal any judgment based on that verdict as well, on the merits.

deliberated the *first* time for approximately three hours and without questions to the trial court. The verdict was read in open court and accepted by the trial court. The jury was polled and then discharged. There is no mistake in the jury's verdict—post-verdict regrets and reservations are not mistakes warranting withdrawal of a verdict. The trial court should have addressed this verdict in an eventual judgment and should never have summoned the jurors to return. Allowing the jury to return this second verdict after tainted questioning was clearly an abuse of discretion for which no adequate remedy by appeal is available. Because of the significant size of the second verdict and many implications if such a verdict is given credence in a final judgment, mandamus is appropriate.

## PRELIMINARY STATEMENT

The trial court's unauthorized actions in this case are without an analog in Texas law. After accepting a $31 million verdict, the court discharged the jury, released it from its instructions, and sent the jurors home. Plaintiffs' counsel then spoke privately with multiple jurors, at least one of whom left this ex parte meeting telling a tale, unmoored in the charge or any instruction, that the jury had meant for its award to be multiplied. Without license in Texas law, the court recalled the released jurors. Contrary to Texas law, it took evidence regarding the jury's verdict. On the basis of this evidence, it ordered the jury to deliberate again, and it then accepted (or "received") the jury's tainted, $172 million second verdict.

This mandamus petition addresses several rulings by the trial court: (1) ordering the jury to reconvene; (2) accepting testimony to impeach and invalidate the verdict; (3) undermining the jury's initial verdict that had been accepted by the court; (4) ordering the discharged jurors to redeliberate; and (5) allowing the jury to return a second verdict and "receiving" this "verdict."

Relator requests that this Court order the trial court to vacate these orders and strike the inadmissible evidence on which they were based. The trial court's actions violate Southcross's right to a trial by an untainted jury; are tantamount to ordering a new trial (and skipping the trial, proceeding directly to a second verdict); and

15

constitute a clear abuse of discretion for which no adequate remedy by appeal exists. A writ of mandamus should issue.

## STATEMENT OF FACTS

The underlying personal injury and death lawsuit stems from a workplace accident that occurred during a hot tap procedure. Plaintiffs[2] sued numerous defendants, including Southcross Energy Partners, GP LLC ("Southcross"). (MR 303) Ivy Gonzalez, the ex-wife of Jesus Gonzalez, Jr., who sustained fatal injuries during the accident, sued on behalf of the estate of Jesus Gonzalez, Jr. (the "estate") and his two minor children, M.R. and M.N. ("Gonzalez children"). Amy and Jesus Gonzalez, Sr., the parents of Jesus Gonzalez, Jr., sued as wrongful death beneficiaries ("Gonzalez parents"). Rene Elizondo, who sustained a broken leg in the accident, also sued Southcross. Plaintiffs alleged negligence and gross negligence against Southcross. (MR 309)

### A. The jury trial, charge of the court, and first verdict.

On September 18, 2017, the underlying case was called to trial. Counsel for both sides announced they were ready to proceed. The jury was selected and then sworn in by the trial court. After both sides rested and all evidence was closed, the

---

[2]  Real Parties in Interest are referred to herein as "Plaintiffs," though they were technically Defendants/Cross-Plaintiffs below.

trial court charged the jury precisely as Plaintiffs requested.[3] (MR 323–44) The jurors affirmed to the court that they understood the jury charge and returned to the jury room to deliberate. (MR 365) After a few hours of deliberations, the jury returned a verdict, awarding $11.42 million in economic and non-economic damages collectively to all Plaintiffs and $20 million in punitive damages to the estate and Elizondo. (MR 122–27, 284–302)

The jury's verdict was announced in open court, without objection. (MR 122–27) Upon the request of counsel, the jury was polled and jurors affirmed their verdict. (MR 128–31) With no objection to the verdict and no objection to the jury poll, the trial court accepted the jury's verdict. (MR 134) The trial court asked the lawyers to propose a final judgment to be entered the following week. (MR 136)

The trial court discharged the jury and released the jurors from the court's strict instruction not to talk to any person about the case. (MR 132–33) Their notes were destroyed as their duties as jurors were over. (MR 232) The jurors then left the courtroom; most left the courthouse and returned to their homes. (MR 166, 193–219)

---

[3] At the charge conference, counsel for Plaintiffs submitted his proposed jury charge. Over Southcross's objections, the trial court granted every definition, instruction, and question requested by Plaintiffs' counsel. (MR 323–44) Plaintiffs' counsel did not object to the final jury charge that was submitted to the jury. (MR 323–44)

**B.     Discharged jurors talk with the lawyers about the verdict and damages award.**

After the 12 jurors were discharged, at least half of them went home. A few jurors, including the foreperson, stayed near the courtroom and spoke with the Plaintiffs' lawyers. The foreperson talked with Plaintiffs' lawyers about the case and the verdict. In her conversation with the lawyers for Plaintiffs, it was "brought it to her attention" that the jury had not awarded the large amounts Plaintiffs' counsel, Mr. Rumley, requested in his closing, though she told Plaintiffs' counsel they thought the verdict was going to be multiplied after the fact. (MR 189) The foreperson agreed with Plaintiffs' counsel that "you can't put a price on life." (MR 187) The foreperson then "made phone calls." (MR 189)

Another juror, who went home after the verdict, talked to Plaintiffs' counsel about the verdict. (MR 201) Apparently on a first name basis with Plaintiffs' counsel, the juror talked with "Mark" about how it is hard to "put a number on someone's life."[4] (MR 201) Other jurors talked to the lawyers about the case and verdict before they left the courthouse. (MR 166–67, 173)

---

[4]   Mark Gonzalez is listed on the pleadings as counsel of record, along with David Rumley.

**C.** **The trial court orders jurors back to the courthouse, the jurors further discuss the verdict in the jury room, and the court accepts evidence that impeaches the verdict's damages award.**

The court conducted a hearing in which Plaintiffs' counsel, but not defense counsel, participated. (MR 164) Afterwards, the court instructed all counsel to return to the courthouse. Over Southcross's objection, the trial court then reassembled the discharged jurors in the courthouse. (MR 166) The jury[5] was first ordered to the jury room where they remained *together* without any instructions and discussed their first verdict and the effect of their answers for at least 30 minutes amongst themselves. (MR 173, 176) This was after some of the jurors had met with Plaintiffs' counsel. While waiting in the jury room, the foreperson told the jurors that the court had called them back because they had made a "mistake" by not multiplying the damages award (by 50). (MR 186–87, 194, 206–07) Thus, before being questioned individually, the jurors—as a group—had an opportunity to discuss their verdict, the effect of their answers, and the reason they had been called back. (MR 212 (they all talked about it in the jury room before being called out to testify))

The court then accepted testimonial evidence from each juror regarding the verdict and whether each juror had intended to award the amounts that were actually

---

[5] Because the discharged jurors were not sworn in again, and were not given the mandatory instructions for jurors under Rule 226a ("the court must five instructions to the jury panel"), the group of former jurors does not constitute a lawful jury. We refer to them as the "jury" herein for lack of a word for "former jurors improperly re-assembled."

stated on the verdict form. (MR 193–219) Most of the jurors said they thought the numbers would be multiplied (MR 193–219)—although why they thought that given the clear wording of the standard PJC damages questions is a mystery. One juror was confused, saying there was "something about a multiplication" but gave no indication of what number he thought would be multiplied or by how much. (MR 208) Another juror said she thought the numbers would be *divided* by 15. (MR 211) One juror said he told the others their numbers would *not* be multiplied and that the final number would be what they wrote down. (MR 213–14)

**D.    The trial court orders the jury to redeliberate, allows the jury to render a second verdict, and then accepts the second verdict.**

After conversations with jurors, Plaintiffs' counsel asked the trial court to reexamine the verdict. (MR 224) Specifically, Plaintiffs' counsel represented to the trial court that the jury "misunderstood" the jury charge and instructions of the court regarding the damages. (MR 224) Counsel told the court that the jury believed the amounts they awarded were on an annual basis and that the court would multiply those amounts by 50, the life expectancy of Jesus Gonzalez, Jr. (MR 186–87) But not all of the jurors suffered from this same misapprehension. (MR 212–14)

Southcross objected to the entire procedure of revisiting the verdict, to taking evidence to impeach the verdict, instructing the jury to redeliberate after they had been subject to outside influence, and taking a "second verdict." (MR 170–79)

20

After receiving the jurors' testimony in violation of governing precedents and Rule 606, urged on by Plaintiffs' counsel, the trial court accepted the testimony as credible evidence to impeach the verdict and sent the jury back to deliberate ***again***. (MR 236–37) The jury was ordered to render their *new* damages award on the original jury verdict form. (MR 236) The jury was not sworn in again by the trial court, and was not given the instructions again about not talking to anyone. The only instructions the court gave to the jury when she called them back as a group into the courtroom, and before sending them back to "re-deliberate" were these:

> THE COURT: I am putting you all in jail. Ha, ha I am just kidding. You may be seated. Okay, ladies and gentlemen of the jury, what I am going to have you all do now I am going to give you a red pen. ***With the red pen you are to write the numbers that you meant to write*** as per your discussions at the bench a while ago. If the numbers change the persons that are members in accord with the verdict, then those additional people sign with the red pen, if it becomes unanimous in other words. I don't know that it will or not but if it does you sign the additional two names or one name, whatever it may be. And that's all I am going to say. That's all I can say. So here is the red pen, go back to the jury room and begin your deliberations."

(MR 236) (emphasis added)

After this rather astounding instruction, the jury returned to the jury room, "redeliberated" for approximately an hour and a half, followed the court's redlining instructions, and inserted strikingly inflated new numbers on the same verdict form. Although a few of the amounts remained the same, most of the individual damages were increased by using a range of *random* multipliers, including 1.3, 1.6, 2, 2.5, 17,

21

to 50—clearly showing this is not the result of some scrivener's error. (Tab 2) While Plaintiffs' counsel informed the trial court that the jury's mistake had to do with future damages only (MR 175), the jury actually wrote new (and much higher) numbers down for past damages as well. (MR 292–97) The jurors did not re-sign the verdict form after the second deliberation, and there is therefore no certificate for the second "verdict."

At the end of the second deliberation, around 10:38 p.m., the trial court received the second verdict and polled the jury again. (MR 245–46)

## SUMMARY OF THE ARGUMENT

The rulings at issue constitute clear abuses of discretion, for which there is no adequate remedy by appeal. The trial abused its discretion by: (1) reassembling a jury *after* they had been discharged and mingled with the lawyers and went home; (2) receiving evidence to impeach a jury's verdict that had already been accepted by the court; (3) allowing the jurors to redeliberate despite the fact that the first verdict was complete and without conflicting findings or mistake; and (4) receiving a second verdict which increased the damages by $141 million.

In sum, the jurors' testimony should be disregarded and stricken from the record, as well as the second erroneous verdict. The trial court's rulings are clear abuses of discretion, and if not corrected now, there is no adequate remedy on appeal.

22

Mandamus is appropriate to remedy this potentially egregious error before a costly, erroneous, and damaging verdict is entered into judgment.

## ARGUMENT

**I.    The trial court's decision to reconvene the jury and receive evidence to impeach the jury's verdict, and allow that same jury to redeliberate, was arbitrary and unreasonable.**

**A.    Trial courts are prohibited from reconvening jurors after they have been discharged and intermingled with the public.**

Once a jury is discharged from their oaths, they are subject to contact with and influence by the parties and others so that the jury **cannot be reconstituted**. *See Caylat v. Houston E. & W. Ry. Co.,* 113 Tex. 131, 252 S.W. 478, 482–83 (Tex. 1923).

In this case, the trial court discharged the jury and released jurors from the court's strict instruction not to talk to any person about the case. (MR 132) The jurors left the courtroom. (MR 134) Some jurors went home and others stayed to talk with Plaintiffs' lawyers. There is no doubt that the jury in this case was discharged and spoke to the lawyers and general public about this case and its verdict. (MR 166, 193–219) The foreperson even made phone calls after she talked to Plaintiffs' counsel about the damages awarded in the case. (MR 189) Because the jury had been discharged and mingled with the lawyers and public, the trial court was prohibited from ordering the jury back to the courtroom. *See id.*; *see also Branham v. Brown*,

23

925 S.W.2d 365, 368 (Tex. App.—Houston [1st Dist.] 1996, no writ) (it is error to reconvene a jury after it has been discharged and has mingled with the public).

In the trial court, Plaintiffs relied on *Dietz v. Bouldin*, 136 S.Ct. 1885 (2016), for the proposition that a trial court has inherent power to recall a discharged jury to continue deliberating. But *Dietz* does not help Plaintiffs. First, neither of the preconditions to application of the *Dietz* rule apply here. *Dietz* concluded that the federal district court had an inherent power to recall a jury because the Federal Rules of Civil Procedure "do not place limits on a [district] court's ability to rescind a prior order discharging a jury." *Id* at 1893. The Texas Rules, by contrast, limit recall to specific circumstances not present here. *See* TEX. R. CIV. P. 295. And the reason for the discharge in *Dietz* was a verdict that, on its face, was "legally impermissible." 136 S.Ct. at 1890. Here, there was no such defect on the face of the verdict; rather, the court resorted to inadmissible evidence to recall the jury.

Second, the *Dietz* court cabined district courts' inherent power to recall discharged juries to circumstances in which it could be ensured that the jury was not tainted after discharge. *Id.* at 1894 ("Any suggestion of prejudice in recalling a discharged jury should counsel a district court not to exercise its inherent power."). It held that discharge was permissible there because the discharge lasted only a few minutes and the "jurors did not speak to any person about the case after discharge." *Id.* at 1895. The circumstances here are far different:

24

- Several jurors had already gone home when recalled, where they could have talked to many different people, and the delay lasted much more than the "few minutes" approved in *Dietz*.

- The jurors talked to many people—most notably to Plaintiffs' counsel, but also the court, court staff, and each other. *See id.* at 1894 ("Even apparently innocuous comments about the case from someone like a courtroom deputy such as 'job well done' may be sufficient to taint a discharged juror . . . ."); *id.* (warning of the "potential for taint" after discharge because "it is not uncommon for attorneys or court staff to talk to jurors post-discharge").

- Plaintiffs' counsel advised the foreperson, and through her the entire jury, that Plaintiffs would not receive what the jury supposedly intended.[6] The jury would thus have understood the order to deliberate again as an order to arrive at a larger verdict. *Cf. id.* at 1894–95 (warning of the possibility that reactions to a verdict will "cause jurors to begin to reconsider their decision").

*Dietz* thus does not apply in Texas, and even if it did it would not permit a jury to deliberate a second time after speaking to a party's counsel about how it arrived at its verdict. Rendition of judgment on the tainted second verdict would violate Southcross's constitutional right to an impartial jury. *See id.* at 1893 ("The inherent power to rescind a discharge order and recall a dismissed jury, therefore, must be carefully circumscribed, especially in light of the guarantee of an impartial jury that is vital to the fair administration of justice."); *Hyundai Motor Co. v.*

---

[6] It is not clear whether anyone advised the jurors that their verdict would be reduced by a settlement credit.

*Vasquez*, 189 S.W.3d 743, 749 (Tex. 2006) ("The Bill of Rights of the Texas

Constitution guarantees litigants a right to trial by a fair and impartial jury.")

> **B.** **Trial courts are expressly prohibited under Rule of Evidence 606 from receiving evidence to invalidate a jury verdict after the verdict has been accepted.**

After the trial court improperly reconvened the discharged jury, it proceeded

to interrogate the jurors about their deliberations, in violation of the long line of case

law cited and Texas Rule of Evidence 606.

Texas Rule of Evidence 606(b) states:

> During an inquiry into the validity of a verdict or indictment, a juror may ***not*** testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

TEX. R. EVID. 606(b)(1) (emphasis added). The Rule provides exceptions for

testimony regarding outside influence on the jury and a juror's lack of

qualification—neither of which is implicated here. *Id*. at 606(b)(2).

A corollary to TRE 606, Texas Rule of Civil Procedure 327(b) states:

> A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. *Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes*.

26

Tex. R. Civ. P. 327(b) (emphasis added).

The Texas Supreme Court has emphasized that Rules 606 and 327 should be taken at face value: "discovery involving jurors should ordinarily be limited to facts and evidence relevant to (1) whether any outside influence was improperly brought to bear upon any juror, and (2) rebuttal of a claim that a juror was not qualified to serve." *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 666 (Tex. 2009).

Under Rules 606 and 327, it is clear that evidence of the jury's mental impressions and jury deliberations *cannot* support a new trial. This Court recently upheld a trial court's denial of a motion for new trial when the only evidence consisted of inadmissible affidavits regarding statements made during deliberations. In *In re Estate of McNutt*, defendants moved for a new trial based on an allegation of juror misconduct. No. 04–15–00110–CV, 2016 WL 519732, at *10 (Tex. App.— San Antonio Feb. 10, 2016, pet. denied). The court noted that, based on Rule 327(b), "a party may not satisfy its burden of proof to show juror misconduct on any bases based solely upon the testimony of fellow jurors regarding matters and statements that occurred during deliberations." *Id.* at *11. Because defendants' evidence consisted solely of juror affidavits regarding deliberations—which evidence is inadmissible—the trial court denied defendants' motion for new trial, and this Court affirmed on appeal. *Id.*

But Rule 606 does not apply only to motions for new trial. It makes evidence of jurors' mental processes inadmissible for *any* purposes—including whether to recall a jury. Indeed, if evidence of the jury's deliberations cannot support a new trial, *a fortiori* it cannot support a new "verdict"—skipping over the new trial.

This case involves a claim of a "misunderstanding" of the charge, but the charge is not unclear, and the best that can be said for the juror's testimony, aside from it being incompetent under the rules, is that somehow some but not all jurors believed some but not all of their damages answers would be increased by the court, despite being told in no uncertain terms by a fellow juror that such was *not* the case. (MR 212–14)

Defense counsel objected to any questioning of the jurors about their verdict after the verdict had been accepted and the jury dismissed. (MR 170, 179) As the questioning itself makes clear that the issue in this case concerns not a scrivener's error but the jury's supposed misunderstanding of the charge and a miscalculation of damages, the jury's testimony regarding their mental impressions and statements made during deliberations cannot be used to support either the second verdict or a new trial. As the Texas Supreme Court has explained, "some reasons underlying the prohibition of unfettered probing into jury deliberations [include]: (1) keeping jury deliberations private to encourage candid discussion of a case, (2) protecting jurors from post-trial harassment or tampering, (3) preventing a disgruntled juror whose

28

view did not prevail from overturning the verdict, and (4) protecting the need for finality." *Ford Motor*, 279 S.W.3d at 666 (citing *Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 366–67 (Tex. 2000)).

**C. Allowing the "jury" to redeliberate and accepting a second verdict is a clear abuse of discretion warranting mandamus.**

"Once a jury is discharged from their oaths, they are subject to contact with and influence by the parties and others so that the jury cannot be reconstituted." *Caylat,* 252 S.W. at 482–83. The group of former jurors called back to the court on Friday night was not sworn in again as jurors, were not given the mandatory instructions in Rule 226a, and did not constitute a jury. *See* TEX. R. CIV. P. 226a. Their collective writing in red pen on the original verdict form is a complete nullity.

It is well settled that the purpose of the Rule 294 poll of the jurors at the conclusion of the trial, under the protection of the Court, "is to afford jurors an opportunity to express their true convictions" and to ensure that at least ten of the same jurors agreed to the answers given to each question and that the same ten jurors agreed to the entire verdict, that is, to the answers to *each and every* question submitted. *See Branham,* 925 S.W.2d 365; TEX. R. CIV. P. 294. Jurors are required to speak at the time of polling with regard to the members who agreed to the verdict and *not* after they have been discharged and have mingled with the public. Once the Court has accepted the verdict and discharged the jury, it has no authority to later order the jury to redeliberate.

29

The trial court in this case abused its discretion when it ordered the former jurors to redeliberate. *Archer Daniels Midland Co. v. Bohall*, 114 S.W.3d 42, 46–47 (Tex. App.—Eastland 2003, no pet.) (concluding that the trial court's ordering the jury to deliberate further on corrected jury charge was impermissible). The court of appeals in *Branham v. Brown*, 925 S.W.2d 365 (Tex. App.—Houston [1st Dist.] 1996, no writ), held that:

> once the judge had accepted the verdict and discharged the jury, he had no authority to later order the jury to redeliberate; he should have proceeded to judgment on the original 11–1 verdict. Therefore, we hold that the trial court ***erred*** in sending the jury back to make any corrections or redeliberate on their verdict after the trial court accepted the verdict and discharged the jury.

*Id.* at 368 (emphasis added). Once a jury has been discharged and has mingled with the public, it is error to reconvene that jury. *Id.* The trial court here far exceeded her power by relying on incompetent evidence to impeach a verdict and then handing the jury a red pen with instructions to go back and write down "what they really meant to write." (MR 236)

## II. The trial court's actions undermining the jury's initial, sworn verdict were an abuse of discretion. The initial verdict was complete, fully responsive to the questions in the charge, and not conflicting.

"A trial court is authorized to set aside a jury verdict which is the result of a unanimous mistake in the nature of a *clerical* error, but not when the verdict results from a misinterpretation of the evidence or the charge of the court." *Adams v. Houston Lighting & Power, Co.*, 314 S.W.2d 826, 829 (Tex. 1958).

30

Here, the trial court refused to accept the first verdict and disallow any further inquiry into the jury's deliberations. Instead, the trial court required them to redeliberate and allowed a wholesale reconsideration of their damage awards. However, after a verdict is returned and represented to the court as being the verdict, and it is accepted by the court and the jury discharged, a showing that some of the jurors (after speaking with counsel, or with the foreperson after she spoke with counsel) claimed to misunderstand the effect of their verdict or wanted to reconsider their answers, or even that the verdict was not unanimous, will not impeach or invalidate the verdict as returned to and accepted by the court. *Dilbeck v. Ideal Bread Co.,* 562 S.W.2d 563 (Tex. Civ. App.—Texarkana 1978, no writ).

The trial court agreed to allow these jurors to *reconvene and redeliberate* on the basis that the jury somehow thought the court would multiply their amounts. But a comparison of the initial damages with the subsequent damages does not support that argument. For instance, some damages remained the same, some were double, and others were multiplied by 15 or 50. (Tab 2)

A juror's doubt, hesitancy, and mental reservations about the verdict do not destroy a verdict. *Branham v. Brown*, 925 S.W.2d 365, 368 (Tex. App.—Houston [1st Dist.] 1996, no writ). A verdict is not destroyed by proof that a juror is not satisfied with the verdict; that the verdict was reached against a juror's better judgment; that the verdict was the result of a compromise; or that the juror voted

31

with the majority under protest. *Id.* The evidence in the record does not establish that a mistake in the nature of a clerical error or otherwise was made. To the contrary, it discloses that the mistake was not in transcribing the verdict, but arose from either a misunderstanding of the court's charge coupled with the desire to award more money.

Moreover, Texas Rule of Procedure 295 allows a correction of the verdict only when the purported verdict is "defective." TEX. R. CIV. P. 295. A verdict is only defective under the Rule if "it is incomplete or not responsive to the questions contained in the court's charge, or the answers to the questions are in conflict." *Id.* Absent one of these limited defects, the verdict acquired the finality of an official act once it is returned and received by the court. *See Branham,* 925 S.W.2d at 368. In fact, before Rule 295 would authorize further instructions to the jury, the verdict must be incomplete, non-responsive, or conflicting in its answers. *See Archer Daniels Midland Co. v. Bohall,* 114 S.W.3d 42, 46 (Tex. App.—Eastland 2003, no pet.).

None of the provisions of Rule 295 permitted the trial court to take the action which it did following the rendition of the jury's initial verdict that was verified under oath by jurors. In fact, Plaintiffs have never contended the verdict was incomplete, non-responsive, or conflicting. All counsel heard the jury's verdict as it was read in open court. Counsel then requested that the jury be polled, and the trial

court complied. At that time, the trial court announced the jury's verdict was accepted. Plaintiffs made no objection to the verdict and did not request the jury be instructed to resolve any perceived inconsistencies. Rather, the answers returned in the initial verdict were complete, the answers were responsive to the questions asked, and the answers were not in conflict. The jury was polled and affirmed the validity of their verdict, without objection.

The first challenge to the verdict arose *after* the jury was discharged and Plaintiffs' counsel questioned the foreperson about the amount of damages awarded in the verdict. Following Plaintiffs' counsel's private conversation with the foreperson, Plaintiffs' counsel approached the court (after defense counsel had left) and claimed that the verdict needed to be corrected and jurors should be called back from their homes because they clearly meant to multiply their numbers.

To impugn the veracity of a jury's verdict based on post-verdict remorse after talking to Plaintiffs' counsel, especially when the verdict is complete, responsive, and consistent, is expressly prohibited by the Texas Rules of Procedure. *See* TEX. R. CIV. P. 295. The trial court abused its discretion, and there is no adequate remedy on appeal if not corrected by this Court.

33

## III. There is no adequate remedy by appeal.

The trial court's actions since the original verdict are an affront to Texas law. It has been acting contrary to law, and it has expressed an intent to continue to do so by requesting briefing and even entertaining the idea that the second verdict is somehow valid. But the harms that stem from the trial court's threatened judgment—to both Southcross and the judicial system—go beyond what can be remedied by an appeal.

The Supreme Court has explained that "extraordinary circumstances . . . warrant[] extraordinary relief, even though it" might typically be unavailable. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 313–14 (Tex. 2010); *see also In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (explaining that an appellate remedy is inadequate when "the benefits [of mandamus] outweigh the detriments"). Here, the circumstances are truly extraordinary: the trial court has suggested a willingness to set aside a verdict that was duly returned and accepted, and instead render judgment on a verdict that is the result of ex parte communications between a discharged jury and Plaintiffs' counsel, among others. These actions undermine the judicial system, and they will encourage counsel in other cases to act similarly and hope for the best. This, in turn, will result in more calls to change or abandon the jury system entirely. This court should quash the trial court's dangerous course of action before it goes any further.

There can be "*only one* verdict in a case, and it is the one accepted and ordered filed by the trial court." *Faulk v. Bluitt*, 211 S.W.3d 418, 421 (Tex. App.—Waco 2006, pet. denied) (emphasis added) (citing *McCarty v. Morrison*, 468 S.W.2d 350, 351–52 (Tex. 1971)). The trial court here received the jury's first verdict. (MR 134) TEX. R. CIV. P. 293. At that point, its duties were effectively ministerial: it had to render judgment on the verdict unless it was set aside, a new trial was granted, or judgment was granted notwithstanding the verdict. TEX. R. CIV. P. 300. By recalling the discharged jury and ordering it to deliberate again, the trial court effectively granted a new trial—but then skipped the trial and went right to the verdict. Worse, the second verdict was rendered by an uncharged, uninstructed, and badly tainted jury, in violation of Southcross's constitutional rights. This roundabout procedure is reviewable by mandamus in the same manner as any trial court order granting a new trial after a verdict. *See In re Toyota Motor Sales, U.S.A., Inc.,* 407 S.W.3d 746, 762 (Tex. 2013) (allowing mandamus review where trial court's new-trial order "lack[s] substantive merit"); *Wilkins v. Methodist Health Care Sys.*, 160 S.W.3d 559, 563 (Tex. 2005) (permitting mandamus where the trial court orders a new trial based on an erroneous finding of conflict in the verdict).

*Toyota* shows that if the trial court is allowed to render judgment on the second verdict, things will already have gone too far. *See Toyota*, 407 S.W.3d at 762 (vacating the new-trial order and ordering the trial court to "render judgment on the

35

[original] verdict"). Because appellate courts review judgments, not interlocutory orders, this Court may not be able to vacate through appeal the unauthorized actions that led the trial court to this point: its recall of the jury, its taking of inadmissible evidence, its reseating a tainted jury, and its receipt of that second tainted jury's verdict. It is only mandamus that would allow this Court to vacate all of these proceedings, leaving the trial court with a clean slate—and only the original verdict.

By doing so, this Court would also head off the procedural problems that will inevitably follow Southcross prevailing in an appeal from judgment on the second verdict. Once the court of appeals vacates the judgment, the case will be remanded—but for what? Will Plaintiffs be allowed to elect to recover under the previous verdict? There is no precedent for a trial court even accepting two separate verdicts, let alone for a plaintiff electing among them. How the trial court ought to proceed will be a tough question that the parties will undoubtedly expend substantial resources litigating in the trail court and on appeal. But these problems can be avoided today by vacating the trial court's actions after accepting the first verdict, allowing the parties to engage in the typical post-verdict and post-judgment practice.

Judgment on the second verdict, nugatory though it is, also subjects Southcross to substantial monetary and business harms. This huge judgment will affect the market. It will be costly to bond. And it will, of course, require the expenditure of resources on a costly but pointless appeal, as Southcross's appeal

36

from judgment on the second verdict will have to challenge not only the trial court's unauthorized procedure, but the judgment's (lack of) merits and the trial court's other errors. Most of this work, though, will then have to be duplicated if the trial court on remand renders judgment on the first verdict. Mandamus is appropriate to spare Southcross these costs. *Cf. In re Team Rocket, L.P.*, 256 S.W.3d 257, 263 (Tex. 2008) (granting mandamus where trial court's abuse of discretion threatened to "result in an irreversible waste of resources"); *Prudential*, 148 S.W.3d at 136 (Tex. 2004) (holding that mandamus is appropriate to "spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings").

## CONCLUSION

The trial court abused its discretion and acted well outside its authority. Its actions caused injuries that cannot be righted on appeal. Mandamus relief is appropriate. Relator requests that this Court issue an order requiring the trial court to (1) vacate its ruling reconvening the jury; (2) strike the testimonial evidence accepted by the trial court to invalidate the verdict; and (3) vacate the trial court's receipt of the second verdict. The trial court's rulings violate Southcross's right to a trial by an impartial and untainted jury and constitute a clear abuse of discretion for which no adequate remedy by appeal exists. A writ of mandamus should issue

37

accordingly. Relator prays for any other relief, at law or in equity, to which it may be entitled.

Respectfully submitted,

By:  */s/ Jessica Z. Barger*
Thomas C. Wright
State Bar No. 22059400
wright@wrightclose.com
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclose.com
E. Marie Jamison
State Bar No. 24044647
jamison@wrightclose.com
Elizabeth H. Rivers
State Bar No. 24052020
rivers@wrightclose.com
**WRIGHT & CLOSE, LLP**
One Riverway, Suite 2200
Houston, TX 77056
713-572-4321 Telephone
713-527-4320 Facsimile

Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Rachel A. Ekery
State Bar No. 00787424
rekery@adjtlaw.com
Nicholas Bacarisse
State Bar No. 24073872
nbacarisse@adjtlaw.com
**ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP**
515 Congress Avenue, Suite 2350
Austin, Texas 78701

38

(512) 482-9300
(512) 482-9303 (facsimile)

*Counsel for Relator*

## RULE 52.3(J) CERTIFICATION

I certify that I have reviewed the foregoing petition for writ of mandamus and have concluded that every factual statement in the petition is supported by competent evidence included in the appendix or record.

*/s/ Jessica Z. Barger*
Jessica Z. Barger

## CERTIFICATE OF COMPLIANCE

I certify that this Petition for Writ of Mandamus complies with the typeface and word-count requirements set forth in the Rules of Appellate Procedure. This Petition for Writ of Mandamus has been prepared using Microsoft Word, in 14-point Times New Roman font for the text and 12-point Times New Roman font for any footnotes. This Petition contains 5,983 words, as determined by the word count feature of the word processing program used to prepare this document (Microsoft Word), excluding those portions of the petition exempted by TEX. R. APP. P. 9.4(i)(1).

*/s/ Jessica Z. Barger*
Jessica Z. Barger

## CERTIFICATE OF SERVICE

I certify that on September 27, 2017, a true and correct copy of the foregoing was served upon the following counsel of record in accordance with the Texas Rules of Appellate Procedure.

Ernest P. Gieger, Jr.            *Via Email* egieger@glllaw.com
Brendan P. Doherty           *Via Email* bdoherty@glllaw.com
Gieger, Laborde & Laperouse, L.L.C.
5151 San Felipe, Suite 750
Houston, Texas 77056

David Rumley           *Via Email* drumley@wigrum.com
Ross W. Evans           *Via Email* revans@wigrum.com
Wigington Rumley Dunn & Blair, L.L.P.
123 N. Carrizo Street
Corpus Christi, Texas 78401

Mark A. Gonzalez           *Via Email* mgon3@yahoo.com
Attorney at Law
924 Leopard Street
Corpus Christi, Texas 78401

Baldemar Gutierrez           *Via Email* balde@gutierrezlawfirm.com
J. Javier Gutierrez           *Via Email* javier@gutierrezlawfirm.com
Ana Gutierrez Castillo           *Via Email* ana@gutierrezlawfirm.com
The Gutierrez Law Firm, Inc.
700 E. Third St.
Alice, Texas 78332

Russell S. Post           *Via Email* rpost@beckredden.com
Chad Flores           *Via Email* cflores@beckredden.com
Mary Kate Raffetto           *Via Email* mkraffetto@beckredden.com
Beck Redden
1221 McKinney, Suite 4500
Houston, Texas 77010-2010

Bryan K. Harris           *Via Email* bkharris@lilesharris.com
Kevin W. Liles           *Via Email* kevin@lilesharris.com
Stuart R. White           *Via Email* swhite@lilesharris.com

Liles Harris White, PLLC
500 North Water Street, Suite 800
Corpus Christi, Texas 78401-0232

| | |
|---|---|
| Honorable Ana Lisa Garza | *Via Email* egonzalez@co.starr.tx.us |
| 229th District Court of Duval County | *Via Email* elida.duenez@co.duval.tx.us |
| P.O. Box 1070 | *Via Overnight Mail* |
| San Diego, TX 78384 | |

*/s/ Jessica Z. Barger*

Jessica Z. Barger

41

# APPENDIX

Tab 1:        Verdict (first and second combined)

Tab 2:        Verdict Chart

# Tab 1
# Verdict
# (first and second combined)

IVY GONZALEZ ON BEHALF OF
M.R. GONZALEZ AND M.N. GONZALEZ,
MINOR CHILDREN
AND
AMY AND JESUS GONZALEZ, SR., AS
HEIRS AT LAW OF JESUS GONZALEZ, JR.;
AND RENE ELIZONDO
        Plaintiffs

vs.

SOUTHCROSS ENERGY PARTNERS GP,
LLC,
        Defendant.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

IN THE DISTRICT COURT

229TH JUDICIAL DISTRICT

DUVAL COUNTY, TEXAS

## CHARGE OF THE COURT

Members of the Jury:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes. You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote. Here are instructions for answering the questions.

Page 1 of 24

1.  Do not let bias, prejudice, or sympathy play any part in your decision.

2.  Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3.  You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.  If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.  All the questions and answers are important. No one should say that any question or answer is not important.

6.  Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

    The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

    A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

7.  Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have. Do not answer questions by drawing straws or by any method of chance.

8.  Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

9.  Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."



MR 285

10. Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

MR 286

## DEFINITIONS

"Southcross" means Southcross Energy Partners GP, LLC. Southcross includes the acts of its employees acting in the scope of their employment if they are acting in the furtherance of the business of their employer.

"Furmanite" means Furmanite Corporation, Furmanite America, Inc., and/or Furmanite US GSG LLC. Furmanite includes the acts of its employees acting in the scope of their employment if they are acting in the furtherance of the business of their employer.

MR 287

## Question No. 1

Did the negligence, if any, of those named below proximately cause the injuries in question?

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an injury.

Answer "Yes" or "No" for each of the following:

(a)     Southcross................................................................................Answer: ___*yes*___

(b)     Furmanite ...............................................................................Answer: ___*yes*___

MR 288

If you answered "yes" to both subparts of Question No. 1, then answer the following question. Otherwise, do not answer the following question.

## Question No. 2

Assign percentages of responsibility only to those you found caused or contributed to cause the injuries. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

For each person you found caused or contributed to cause the injuries, find the percentage of responsibility attributable to each:

(a)    Southcross ................................................................Answer: ____70____

(b)    Furmanite ................................................................Answer: ____30____

Total:    ____100%____

MR 289

If you answered "yes" to Question No. 1(b) regarding Furmanite's negligence, then answer the following question. Otherwise, do not answer the following question.

### Question No. 3

Did the failure to ensure that the hot tap was performed by a crew qualified to make hot taps proximately cause the injuries in question?

Answer "Yes" or "No."

Answer: _____ Yes _____

MR 290

If you answered "yes" to Question No. 1(b) regarding Furmanite's negligence, then answer the following question. Otherwise, do not answer the following question.

## Question No. 4

Did the hot tap work that Southcross hired Furmanite to do meet any of the following conditions?

   a.    Did it involve a special danger to others which Southcross knew or had reason to know was inherent in or normal to the work?

Answer "Yes" or "No" ..................................................................Answer: ___*yes*___

   b.    Was it likely to create during its progress a peculiar risk of physical harm to others unless special precautions were taken?

Answer "Yes" or "No" ..................................................................Answer: ___*yes*___

   c.    Did it threaten a grave risk of serious bodily harm or death unless the instrumentalities used were carefully maintained?

Answer "Yes" or "No" ..................................................................Answer: ___*yes*___



Page 9 of 24

If you answered "yes" to either subpart in Question No. 1, then answer the following question. Otherwise, do not answer the following question.

## Question No. 5

What sum of money, if paid now in cash, would fairly and reasonably compensate Maygan Gonzalez and Mia Gonzalez for their damages, if any, resulting from the death of her father, Jesus Gonzalez, Jr.?

Consider the following elements of damages, if any, and none other. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

For elements (c)-(f) of damages listed below, you may consider the relationship between Maygan Gonzalez and Mia Gonzalez and their father, Jesus Gonzalez, Jr., their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer separately in dollars and cents for damages, if any.

(a)     Pecuniary loss sustained in the past:

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Maygan Gonzalez and Mia Gonzalez in reasonable probability, would have received from ~~their~~ father, Jesus Gonzalez, Jr. had he lived.

Maygan Gonzales.............................................................Answer: $ 200,000.⁰⁰ ~~10,000,000~~

Mia Gonzales ................................................................Answer: $ 200,000.⁰⁰ ~~10,000,000~~

(b)     Pecuniary loss that, in reasonable probability, will be sustained in the future:

Maygan Gonzales.............................................................Answer: $ 100,000.⁰⁰ ~~5,000,000~~

Mia Gonzales ................................................................Answer: $ 100,000.⁰⁰ ~~5,000,000~~



Page 9 of 24

MR 292

(c)     Loss of companionship sustained in the past:

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Maygan Gonzalez and Mia Gonzalez in reasonable probability, would have received from their father, Jesus Gonzalez, Jr. had he lived:

Maygan Gonzales.............................................Answer: $ 500,000. 00 / 1,000,000

Mia Gonzales ...............................................Answer: $ 500,000. 00 / 1,000,000

(d)     Loss of companionship that, in reasonable probability, will be sustained in the future:

Maygan Gonzales.............................................Answer: $ 500,000. 00 / 25,000,000

Mia Gonzales ...............................................Answer: $ 500,000. 00 / 25,000,000

(e)     Mental anguish sustained in the past:

"Mental anguish" means the emotional pain, torment, and suffering experienced by Maygan Gonzalez and Mia Gonzalez because of the death of their father, Jesus Gonzalez, Jr.

Maygan Gonzales.............................................Answer: $ 200,000. 00 / 500,000

Mia Gonzales ...............................................Answer: $ 200,000. 00 / 500,000

(f)     Mental anguish that, in reasonable probability, will be sustained in the future:

Maygan Gonzales.............................................Answer: $ 200,000. 00 / 10,000,000

Mia Gonzales ...............................................Answer: $ 200,000. 00 / 10,000,000



MR 293

If you answered "yes" to either subpart in Question No. 1, then answer the following question. Otherwise, do not answer the following question.

## Question No. 6

What sum of money, if paid now in cash, would fairly and reasonably compensate Amy Gonzalez and Jesus Gonzalez, Sr. for their damages, if any, resulting from the death of their son, Jesus Gonzalez, Jr.?

Consider the following elements of damages, if any, and none other. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

For elements (c)-(f) of damages listed below, you may consider the relationship between Amy Gonzalez and Jesus Gonzalez, Sr. and their son, Jesus Gonzalez, Jr., their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer separately in dollars and cents for damages, if any.

(a)     Pecuniary loss sustained in the past:

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Amy Gonzalez and Jesus Gonzalez, Sr. in reasonable probability, would have received from their son, Jesus Gonzalez, Jr. had he lived.

Amy Gonzales............................................................ Answer: $ 100,000 . 00   250,000

Jesus Gonzalez, Sr. ..................................................... Answer: $ 100,000 . 00   250,000

(b)     Pecuniary loss that, in reasonable probability, will be sustained in the future:

Amy Gonzales............................................................ Answer: $ 100,000 . 00   3,000,000

Jesus Gonzalez, Sr. ..................................................... Answer: $ 100,000 . 00   3,000,000

Page 11 of 24

(c)     Loss of companionship and society sustained in the past:

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Amy Gonzalez and Jesus Gonzalez, Sr. in reasonable probability, would have received from their son, Jesus Gonzalez, Jr. had he lived.

Amy Gonzales........................................................ Answer: $ 150,000.00    250,000

Jesus Gonzalez, Sr. ................................................ Answer: $ 150,000.00    250,000

(d)     Loss of companionship that, in reasonable probability, will be sustained in the future:

Amy Gonzales........................................................ Answer: $ 150,000.00    4,500,000

Jesus Gonzalez, Sr. ................................................ Answer: $ 150,000.00    4,500,000

(e)     Mental anguish sustained in the past:

"Mental anguish" means the emotional pain, torment, and suffering experienced by that Amy Gonzalez and Jesus Gonzalez, Sr. in reasonable probability, would have received from their son because of the death of their son, Jesus Gonzalez, Jr.

Amy Gonzales........................................................ Answer: $ 150,000.00    250,000

Jesus Gonzalez, Sr. ................................................ Answer: $ 150,000.00    250,000

(f)     Mental anguish that, in reasonable probability, will be sustained in the future:

Amy Gonzales........................................................ Answer: $ 150,000.00    4,500,000

Jesus Gonzalez, Sr. ................................................ Answer: $ 150,000.00    4,500,000



MR 295

If you answered "yes" to either subpart in Question No. 1, then answer the following question. Otherwise, do not answer the following question.

**Question No. 7**

What sum of money would have fairly compensated Jesus Gonzalez, Jr. for his physical pain and mental anguish?

> "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by Jesus Gonzalez, Jr., before his death as a result of the occurrence in question.

Answer in dollars and cents for damages, if any.

Physical pain and mental anguish.................................................... Answer: 850,000. &

14,450,000

MR 296

If you answered "yes" to either subpart in Question No. 1, then answer the following question. Otherwise, do not answer the following question.

**Question No. 8**

What sum of money, if paid now in cash, would fairly and reasonably compensate Rene Elizondo, for his injuries, if any, resulting from injuries in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for damages, if any.

(a)   Physical pain and mental anguish sustained in the past........... Answer: 100,000.00 ~~250,000~~

(b)   Physical pain and mental anguish that, in reasonable probability, Rene Elizondo will sustain in the future. ........... Answer: 50,000.00 ~~2,500,000~~

(c)   Loss of earning capacity Rene Elizondo sustained in the past. ...................................................... Answer: 20,000.00

(d)   Loss of earning capacity that Rene Elizondo, in reasonable probability, will sustain in the future. ...................................... Answer: 1,000,000.00

(e)   Disfigurement sustained in the past. ...................................... Answer: 200,000.00 ~~500,000~~

(f)   Disfigurement that, in reasonable probability, Rene Elizondo will sustain in the future. ............................... Answer: 1,000,000.00 ~~2,000,000~~

(g)   Physical impairment sustained in the past. ............................. Answer: 200,000.00 ~~500,000~~

(h)   Physical impairment that, in reasonable probability, Rene Elizondo will sustain in the future. ........... Answer: 1,500,000.00 ~~2,000,000~~

(i)   Medical care expense that, in reasonable probability, Rene Elizondo will sustain in the future. ........... Answer: 1,500,000.00 ~~2,000,000~~



MR 297

If you have unanimously answered "yes" to Question No. 1(a), then answer the following question. Otherwise, do not answer the following question.

## Question No. 9

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Do you find by clear and convincing evidence that the harm to Jesus Gonzalez, Jr. and Rene Elizondo resulted from gross negligence attributable to Southcross?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Gross negligence" means an act or omission by William Boyer,

1.  which when viewed objectively from the standpoint of William Boyer at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

2.  of which William Boyer has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

You are further instructed that Southcross may be grossly negligent because of an act by William Boyer if, but only if (a) Southcross Energy Partners GP, LLC authorized the doing and the manner of the act, or (b) William Boyer was unfit and Southcross was reckless in employing him, or (c) William Boyer was employed as a vice-principal and was acting in the scope of employment, or (d) Southcross or a vice-principal of Southcross ratified or approved the act.

The term "vice-principal" means: (a) a corporate officer; (b) a person who has authority to employ, direct, and discharge an employee of Southcross; (c) a person engaged in the performance of nondelegable or absolute duties of Southcross; (d) a person to whom Southcross has confided the management of the whole or a department or division of the business of Southcross.

Answer "Yes" or "No."

**Answer:** _____Yes_____



Page 13 of 24

MR 298

If you have unanimously answered "yes" to Question No. 9, then answer the following question. Otherwise, do not answer the following question.

## Question No. 10

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, should be assessed against Southcross and awarded to Jesus Gonzalez, Jr. or Rene Elizondo as exemplary damages for the conduct you found in response to Question 9?

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. "Exemplary damages" includes punitive damages.

Factors to consider in awarding exemplary damage, if any, are –

a.    The nature of the wrong.
b.    The character of the conduct involved.
c.    The degree of culpability of the wrongdoer.
d.    The situation and sensibilities of the parties concerned.
e.    The extent to which such conduct offends a public sense of justice and propriety.

Answer in dollars and cents, if any, as to each of the following:

Ivy Gonzalez, as Administrator of the Estate ............ Answer: $ 15,000,000.00
of Jesus Gonzalez, Jr.

Rene Elizondo. ........................................................ Answer: $ 5,000,000.00

Page 10 of 21

MR 299

## Presiding Juror

1.  When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.  The presiding juror has these duties:

    a.  have the complete charge read aloud if it will be helpful to your deliberations;

    b.  preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

    c.  give written questions or comments to the bailiff who will give them to the judge;

    d.  write down the answer you agree on;

    e.  get the signatures for the verdict certificate; and

    f.  notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.



MR 300

## Instructions for Signing the Verdict Certificate

1.  Unless otherwise instructed, you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2.  If 10 jurors agree on every answer, those 10 jurors sign the verdict. If 11 jurors agree on every answer, those 11 jurors sign the verdict. If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.  All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

4.  There are some special instructions before Questions 9 and 10 explaining how to answer those questions. Please follow the instructions. If all twelve of you answer those questions, you will need to complete a second verdict certificate for those questions.

Do you understand these instructions? If you do not, please tell me now.

_Diana C. Lopez_
JUDGE PRESIDING

MR 301

## Verdict Certificate

Check one:

_____ Our verdict is unanimous. All twelve of us have agreed to these answers. The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror                    Printed Name of Presiding Juror

OR *oef*

__✓__ Our verdict is not unanimous. Ten or eleven of us have agreed to these answers and those ten or eleven have signed the certificate below.

Signature                                          Printed Name of Juror

1. *Esmeralda Lopez*          Esmeralda Lopez
2. *Esmeralda Peña*          Esmeralda Peña
3. *Melinda Sue Chapa*          Melinda Sue Chapa
4. *Brianna Perez*          Brianna Perez
5. *Eduardo Garza*          Eduardo Garza
6. *Eugenio Luna*          Eugenio Luna
7. *Roland Ramos*          Roland Ramos
8. *Arnoldo Salinas*          ARNoldo SaliNas
9. *Cynthia V. Hinojosa*          Cynthia V. Hinojosa
10. *Diana C. Lopez*          Diana C. Lopez
11. _____          _____

## Additional Certificate

I certify that the jury was unanimous in answering Questions 9 and 10. All twelve of us agreed to each of the answers. The presiding juror has signed the certificate for all twelve of us.

*Diana C. Lopez*                    Diana C. Lopez
Signature of Presiding Juror          Printed Name of Presiding Juror

MR 302

# Tab 2

# Verdict Comparisons

## VERDICT COMPARISONS

| Plaintiff | Category of Damages | Original Verdict | Second Verdict | Difference by Dollar | Multiplier |
|---|---|---|---|---|---|
| **M.N. Gonzalez** (Ques. 5) | Past Pecuniary Loss | $200,000 | $10 MM | $9.8 MM | 50 |
| | Future Pecuniary Loss | $100,000 | $5 MM | $4.9 MM | 50 |
| | Past Loss of Companionship | $500,000 | $1 MM | $500,000 | 2 |
| | Future Loss of Companionship | $500,000 | $25 MM | $24.5 MM | 50 |
| | Past Mental Anguish | $200,000 | $500,000 | $300,000 | 2.5 |
| | Future Mental Anguish | $200,000 | $10 MM | $9.8 MM | 50 |
| | | **Total: $ 1.7 MM** | **Total: $ 51.5 MM** | **$ 49.8 MM** | **30.29** |
| **M.R. Gonzalez** (Ques. 5) | Past Pecuniary Loss | $200,000 | $10 MM | $9.8 MM | 50 |
| | Future Pecuniary Loss | $100,000 | $5 MM | $4.9 MM | 50 |
| | Past Loss of Companionship | $500,000 | $1 MM | $500,000 | 2 |
| | Future Loss of Companionship | $500,000 | $25 MM | $24.5 MM | 50 |
| | Past Mental Anguish | $200,000 | $500,000 | $300,000 | 2.5 |
| | Future Mental Anguish | $200,000 | $10 MM | $9.8 MM | 50 |
| | | **Total: $ 1.7 MM** | **Total: $ 51.5 MM** | **$ 49.8 MM** | **30.29** |

| Plaintiff | Category of Damages | Original Verdict | Second Verdict | Difference by Dollar | Multiplier |
|---|---|---|---|---|---|
| A. Gonzalez (Ques. 6) | Past Pecuniary Loss | $100,000 | $250,000 | $150,000 | 2.5 |
| | Future Pecuniary Loss | $100,000 | $3 MM | $2.9 MM | 30 |
| | Past Loss of Companionship | $150,000 | $250,000 | $100,000 | 1.67 |
| | Future Loss of Companionship | $150,000 | $4.5 MM | $4.35 MM | 30 |
| | Past Mental Anguish | $150,000 | $250,000 | $100,000 | 1.67 |
| | Future Mental Anguish | $150,000 | $4.5 MM | $ 4.35 MM | 30 |
| | | Total: $ 800,000 | Total: $12.75 MM | $11.95 MM | 15.94 |
| J. Gonzalez, Sr. (Ques. 6) | Past Pecuniary Loss | $100,000 | $250,000 | $150,000 | 2.5 |
| | Future Pecuniary Loss | $100,000 | $3 MM | $2.9 MM | 30 |
| | Past Loss of Companionship | $150,000 | $250,000 | $100,000 | 1.67 |
| | Future Loss of Companionship | $150,000 | $4.5 MM | $4.35 MM | 30 |
| | Past Mental Anguish | $150,000 | $250,000 | $100,000 | 1.67 |
| | Future Mental Anguish | $150,000 | $4.5 MM | $4.35 MM | 30 |
| | | Total: $ 800,000 | Total: $12.75 MM | $11.95 MM | 15.94 |

| Plaintiff | Category of Damages | Original Verdict | Second Verdict | Difference by Dollar | Multiplier |
|---|---|---|---|---|---|
| **Gonzalez Estate** (Ques. 7) | Physical Pain & Mental Anguish | $850,000 | $14.45 MM | $13.6 MM | 17 |
| | | **Total: $ 850,000** | **Total: $14.45 MM** | **$13.6 MM** | **17** |
| **Elizondo** (Ques. 8) | Past Physical Pain/mental anguish | $100,000 | $250,000 | $150,000 | 2.5 |
| | Future Physical Pain/mental anguish | $50,000 | $2.5 MM | $2.45 MM | 50 |
| | Past Earning Capacity | $20,000 | $20,000 | Same amount | 1 |
| | Future Earning Capacity | $1 MM | $1 MM | Same amount | 1 |
| | Past Disfigurement | $200,000 | $500,000 | $300,000 | 2.5 |
| | Future Disfigurement | $1 MM | $2 MM | $1 MM | 2 |
| | Past Impairment | $200,000 | $500,000 | $300,000 | 2.5 |
| | Future Impairment | $1.5 MM | $2 MM | $500,000 | 1.33 |
| | Future Medical Expenses | $1.5 MM | $2 MM | $500,000 | 1.33 |
| | | **Total: $5.57 MM** | **Total: $10.77 MM** | **$5.2 MM** | **1.93** |

| | | | | | |
|---|---|---|---|---|---|
| **Gonzalez Estate** (Ques. 10 - Gross) | Exemplary | $15 MM | $15 MM | Same amount | 1 |
| **Elizondo** (Ques. 10 - Gross) | Exemplary | $5 MM | $5 MM | Same amount | 1 |
| | | **Total: $20 MM** | **Total: $20 MM** | | 1 |
| | **TOTAL VERDICTS:** | **$31.42 MM** | **$173.72 MM** | **$142.3 MM** | **5.53** |

4